**Richard JACQUES, Plaintiff–Appellant,**

v.

**CLEAN–UP GROUP, INC., Defendant–Appellee.**

No. 95–2209.

United States Court of Appeals, First Circuit.

Heard April 3, 1996.

Decided Sept. 19, 1996.

---

Eric M. Mehnert, with whom Hawkes & Mehnert, was on brief, Augusta, ME, for appellant.

John S. Bobrowiecki, Jr., with whom Farris, Susi, Heselton & Ladd, P.A., was on brief, Gardiner, ME, for appellee.

Before TORRUELLA, Chief Judge, CYR and BOUDIN, Circuit Judges.

TORRUELLA, Chief Judge.

Appellant Richard Jacques ("Jacques"), a person with epilepsy, brought suit against Appellee Clean–Up Group, Inc. ("the Group") seeking damages under the Americans with Disabilities Act ("the ADA" or "the Act"), 42 U.S.C. § 12101 *et seq.* The jury returned a verdict in favor the Group and, subsequently, the district court denied Jacques' motion for judgment as a matter of law pursuant to Federal Rules of Civil Procedure 50 and upheld the jury verdict. Before us is Jacques' appeal of the decision and judgment below. Jacques also appeals from an evidentiary ruling. We affirm.

## I. BACKGROUND

Jacques argues that there is insufficient evidence to support the jury verdict and that the district court therefore should have granted his motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a) & (b). We review the court's denial of the Rule 50 motion *de novo,* examining the evidence in the light most favorable to the nonmovant, the Group. *Golden Rule Ins. Co. v. Atallah,* 45 F.3d 512, 516 (1st Cir.1995). "[W]e may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." *Wagenmann v. Adams,* 829 F.2d 196, 200 (1st Cir.1987). Reversal of the denial of the motion is warranted "only if the facts and inferences 'point so strongly and overwhelmingly in favor of the movant' that a reasonable jury could not have reached a verdict against that party." *Atallah,* 45 F.3d at 516 (quoting *Acevedo–Díaz v. Aponte,* 1 F.3d 62, 66 (1st Cir.1993)).

Thus, we present the facts in the light most favorable to the Group as the jury could have found them.

Clean–Up Group, Inc., a Maine corporation, is a small cleaning company, located approximately two-and-a-half miles from Jacques' residence. Jacques was employed by the Group as an all-purpose cleaning person between November 6, 1993, and February 1994. Because of his epilepsy, Jacques is not permitted to operate a motor vehicle in Maine. Throughout his employment, the Group had regularly assigned Jacques to more than forty hours per week at various job sites and considered him to be a conscientious and good worker. Jacques reported to his various assignments by walking, riding his bicycle, or riding in one of the Group's vans, which were routinely used when employees, working as a crew, and equipment had to be transported to a job site. Employees riding in vans were driven to and from the Group's office. The Group had never provided transportation to its employees under other circumstances. On February 19, 1994, Jacques was laid off from the Group when the crew to which Jacques was assigned was dissolved. A few days later, on February 24, the Group offered Jacques a full-time assignment cleaning the Kennebec Ice Arena (the "Arena"), which was about three miles from Jacques' home. Of those laid off, Jacques was the only one of his crew to be offered another assignment. Although he had never requested a ride to an assignment in the past, because he could not drive and the Arena was approximately three miles from his home, Jacques asked the Group's manager, Chris Buck ("Buck"), whether he would be catching a ride from the Group's headquarters or whether a company van would pick him up on its way to the job site. Buck replied that Jacques would have to arrange for his own transportation to the Arena. Jacques' response was that he would inquire into bus routes and schedules and would telephone Buck right back. Upon gathering the relevant information, Jacques telephoned Buck and informed him that he could take a bus and arrive at the Arena sometime between 10:00 a.m. and 10:30 a.m. In reply, Buck informed him that starting at that time was unacceptable. The Arena as-

signment required a start time of 8:00 a.m. as certain public areas had to be completed prior to, at least, 9:30 a.m. Buck told Jacques that he would find someone else for the Arena assignment. Another employee, who the evidence shows did not have a disability, was subsequently assigned to that assignment.

Jacques was not dismissed from the Group for his failure to perform the Arena assignment and continued to be assigned to work seven hours a week on Sundays at the Carlton Woolen Mills (the "Mills"), an assignment which generally was considered one of the dirtiest. Jacques had previously worked at the Mills. The record suggests that it was often an assignment Group employees did in order to earn overtime. The Group provided Jacques with transportation to the Mills in one of the company vans in which two other employees also traveled. Jacques reported to the Mills assignment from February 27, 1994, through March 27, 1994, at which point Jacques discontinued reporting to that assignment. Jacques has not worked for the Group since then. Shortly after February 25, 1994, Jacques began soliciting direct employment from some of the Group's customers. In connection with his job search, Jacques sent a letter dated March 3, 1994, to one of the Group's customers, in which he made disparaging statements about the Group (the "March 3 letter").

Jacques subsequently brought this civil action under the ADA, alleging that the Group discriminated against him in regard to his right of return from layoff, rehire and job assignment by failing to find a "reasonable accommodation" for his disability.[1] After the court denied Jacques' motion for partial summary judgment,[2] the issues of intentional discrimination and punitive damages were tried to a jury on July 11, 1995. At the close of the Group's evidence, Jacques moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50, which motion was denied. On July 17, 1995, the jury returned a verdict finding that the Group did not illegally discriminate against Jacques on the basis of his disability and, consequently, did not reach the issues of compensatory and punitive damages. Appellant moved again for judgment as a matter of law pursuant to Fed.R.Civ.P. 50. After reviewing briefs from both parties, the district court issued its memorandum and decision on October 2, 1995, in which it denied Jacques' motion and entered judgment in accordance with the jury verdict.

## II. APPLICABLE LAW

The ADA is a federal civil rights statute, enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). "In the employment context, the ADA prohibits a 'covered entity' (defined as 'a person engaged in an industry affecting commerce who has 15 or more employees') from 'discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" *Katz v. City Metal Co., Inc.,* 87 F.3d 26, 30 (1st Cir.1996) (quoting 42 U.S.C. § 12112(a)); *see Grenier v. Cyanamid Plastics, Inc.,* 70 F.3d 667, 671 (1st Cir.1995). The regulations[3] adopted under the ADA provide that it is unlawful for a covered

---

**1.** Jacques does not allege that he was discriminated against in termination or layoff. Indeed, not only is it uncontroverted that the Group did not terminate Jacques for his failure to fulfill the Arena assignment and that Jacques continued to be assigned to the weekly Mills assignment, but the evidence clearly shows that Jacques stopped reporting to the Mills assignment and the Group on his own volition.

**2.** The district court denied summary judgment on the grounds that there was "a material dispute about whether [Jacques'] employment was terminated, and there [was] insufficient evidence

that [Jacques] suffered some other adverse employment action." Memorandum of Decision, May 23, 1995 (Docket No. 23).

**3.** "Such administrative interpretations of the Act by the enforcing agency, 'while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Grenier,* 70 F.3d at 672 (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986)).

entity to discriminate on the basis of "disability," *see* 42 U.S.C. § 12102(2) (defining term), against a "qualified individual with a disability," *see* 42 U.S.C. § 12111(8) (defining term), in regard to, *inter alia,* the right of return from layoff, 29 C.F.R. Ch. XIV § 1630.4(b), and job assignments, 29 C.F.R. Ch. XIV § 1630.4(d).

The ADA further provides that the term "discriminate" includes:

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity....

42 U.S.C. § 12112(b)(5)(A). Reasonable accommodations include, *inter alia,* "job restructuring [and] part-time or modified work schedules." 42 U.S.C. § 12111(9); *see* 29 C.F.R.App. § 1630.2(*o*) (defining reasonable accommodation). Furthermore, in order

> [t]o determine the appropriate reasonable accommodation, it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individuals with a disability in need of the accommodation.

29 C.F.R. § 1630.2(*o*)(3).

■■■ To establish a claim of disability discrimination under the ADA, a plaintiff must prove three things by a preponderance of the evidence:

> First, that he [or she] was disabled within the meaning of the Act. Second, that with or without reasonable accommodation he [or she] was able to perform the essential functions of [the] job. And, third, that the employer discharged him [or her] in whole or in part because of his [or her] disability.

*Katz,* 87 F.3d at 30. A plaintiff may also indirectly prove his or her case "by using the *prima facie* case and burden shifting methods that originated in *McDonnell Douglas*

*Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Id.* n. 2 (citations omitted); *see Taylor v. Principal Financial Group, Inc.,* 93 F.3d 155, 162–63 (5th Cir. 1996) (citations omitted). Under the *McDonnell Douglas* analysis, a plaintiff must first prove by a preponderance of the evidence that he or she (i) has a disability within the meaning of the Act; (ii) is qualified to perform the essential functions of the job, with or without reasonable accommodations; (iii) was subject to an adverse employment action by a company subject to the Act; (iv) was replaced by a non-disabled person or was treated less favorably than non-disabled employees; and (v) suffered damages as a result. See *Taylor,* 93 F.3d at 162–63.

## III. PROCEEDINGS BELOW

Below, the Group stipulated to the following: (i) at the time of Jacques' separation from the Group, it was subject to the ADA; (ii) Jacques is "disabled" within the meaning of the ADA; and (iii) the Group was aware of Jacques' disability and inability to drive a car at the time of the alleged discrimination. As the district court correctly found, Jacques was clearly qualified, indeed over-qualified given his education, for the position of a general purpose cleaner. However, the Group argued that Jacques was not "otherwise qualified" because he could not fulfill, with or without reasonable accommodation, the "essential function"[4] of arriving at the Arena by 8:00 a.m. and that his suggested accommodations—transportation and a later starting time—would pose an undue burden on the Group. The jury, thus, was charged with determining whether Jacques was otherwise qualified to perform the essential function of the job, with or without reasonable accommodation; whether the Group illegally discriminated against him on the basis of his disability; and, if so, if he suffered damages as a result. Because the jury resolved the merits against Jacques, the question of damages was never addressed.

---

4. The EEOC regulations define the term "essential functions" as "the fundamental job duties of the employment position the individual with a disability holds" and "does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). Among other reasons, a job function may be considered essential because the position exists to perform that particular function. *See* 29 C.F.R. § 1630.2(n)(2); *Larkins v. CIBA Vision Corp.,* 858 F.Supp. 1572, 1580 (N.D.Ga.1994).

Based on the evidence, the district court concluded that a reasonable jury could find: (i) that the completion time of the Arena assignment was an essential element of the position, *see* 29 C.F.R.App. § 1630.2(n); (ii) that there was no reasonable accommodation to Jacques' disability that would not pose an undue hardship to the Group,[5] *see* 42 U.S.C. § 12111(10); and (iii) that for these reasons, the jury could reasonably find that Jacques was not otherwise qualified to perform the essential function of the Arena assignment, with or without reasonable accommodation.

## IV. DISCUSSION

■ Turning to the appeal before us, we note first that Jacques conceded during oral argument that an essential function of the Arena assignment was the 8:00 a.m. start time. Consequently, in light of the Group's stipulations below and Jacques' concession, resolution of this appeal hinges only on whether the jury properly found that Jacques was not "otherwise qualified, with or without reasonable accommodation" to perform the Arena assignment's essential function of arriving by 8:00 a.m.

After reviewing *de novo* the evidence in the light most favorable to the Group as the nonmovant, *Atallah,* 45 F.3d at 516, we agree with the district court that a reasonable jury could reach the conclusions it set forth in its decision. Indeed, the jury reasonably could have found that Jacques' disability was not a motivating factor in the Group's decision to find a replacement for the Arena assignment. Not only was Jacques the only person from the laid-off crew to have been offered the opportunity to return from layoff, but at the time Jacques was offered the Arena assignment the Group (including Buck) had full knowledge of Jacques' disability and his inability to drive; indeed, the record shows that, with respect to the Arena assignment, Jacques was both "hired" and "fired" by the same person, Buck. *See Tyndall,* 31 F.3d at 214 (noting that there is a strong inference of nondiscrimination where the hirer and firer are the same person).

Furthermore, the record strongly suggests that Jacques could have fulfilled the essential function of arriving at the Arena by 8:00 a.m. *without* the need for a reasonable accommodation. Jacques testified that he was quite willing to make his own way to the Group's office some two and half miles from his home, however, he never explained why he was unwilling to go the approximate extra half a mile to the Arena. The jury reasonably could have been swayed by this unexplained refusal given the uncontroverted evidence that Jacques had never previously requested transportation and had always made his way to the Group's office.

Or, in the alternative, the jury reasonably could have found that providing Jacques with transportation constituted an undue burden for the Group as there was testimony to the effect that: (i) all of the Group's vans were assigned to other crews and were unavailable to transport Jacques; (ii) no other Group employee was available to provide Jacques with transportation on a daily basis; and (iii) it would be economically detrimental for the Group to hire another individual to drive Jacques in light of its profit margin. Further still, the jury reasonably could have found that accommodating Jacques by permitting him to start after 10:00 a.m., by splitting his shift with another employee, or by reassignment to another crew would be unreasonable as it would eliminate the job's essential function of arriving at 8:00 a.m. *See, e.g., Treadwell v. Alexander,* 707 F.2d 473, 478 (11th Cir.1983) (affirming district court conclusion that, in light of agency's limited resources, "doubling up" employees would impose an "undue hardship"); *Larkins v. CIBA Vision Corp.,* 858 F.Supp. 1572, 1583 (N.D.Ga.1994) (holding that the ADA does not require an employer to eliminate the essential functions of a job to accommodate an employee).

■ This does not end our inquiry, however, as Jacques faults the district court's denial of his Fed.R.Civ.P. 50 motion. He argues here, as he did below, that the Group

5. According to the Group, the Mills assignment was not intended to be a reasonable accommoda-tion for Jacques.

discriminated against him as a matter of law through its uncontroverted failure to engage in an "informal, interactive process" with him, within the meaning of 29 C.F.R. § 1630.2(*o*)(3), in order to determine whether a reasonable accommodation could have been made so that Jacques could get to the Arena by 8:00 a.m.[6] The reasonableness of Jacques' suggested accommodations and the question of any undue burden for the Group, Jacques contends, are not even reached in this case. As Jacques admitted in oral argument, the fundamental basis of his claim is that the Group's failure to look for, or suggest, alternative accommodations constitutes a violation even where, as here, there is no proof that any informal interactive process would have actually borne any fruit.

For legal support, Jacques relies on 29 C.F.R. § 1630.2(*o*)(3). In response to the Group's observation that Jacques' brief provides no case law to support his argument, during oral argument Jacques pointed us to three cases interpreting analogous provisions in the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*,[7] and California's Fair Employment and Housing Act ("FEHA"). These cases, he contends, support his assertion that it is an employer's duty to suggest and provide reasonable accommodations to the employee. *See Buckingham v. United States*, 998 F.2d 735, 739–41 (9th Cir.1993) (upholding denial of summary judgment for employer on the grounds that there is no *per se* rule against employee transfers under the Rehabilitation Act and that employers have duty to "gather sufficient information" when accommodation is required to enable employee to perform essential function); *Sargent v. Litton Systems, Inc.*, 841 F.Supp. 956 (N.D.Ca.1994) (denying summary judgment under FEHA where genuine issue of material fact existed regarding employer's efforts to accommodate and existence of undue hardship); *Butler v. Dept. of the Navy*, 595 F.Supp. 1063, 1068 (D.Md.1984) (noting that government's duty to propose or make rea-

sonable accommodations cannot be triggered by mere existence of handicapped employee where there is no evidence that employee was not reasonably accommodated and finding that employee failed to show how reasons for dismissal were caused by failure to reasonably accommodate).

For record support, Jacques points to trial testimony elicited by the Group's after-the-fact investigation into three area organizations that provide transportation to disabled individuals. This testimony, Jacques argues, not only demonstrates his complete unawareness until asked on cross-examination that those services existed but also that the Group was better situated to ascertain alternative reasonable accommodations. Their failure to do so, he points out, is not surprising given the undisputed testimony that the Group, while aware that it was subject to the ADA, was unaware of ADA provisions regarding reasonable accommodations.

The Group counters with two points. First, the Group argues that 29 C.F.R. § 1630.2(*o*)(3) does not impose an affirmative obligation upon the employer as it explicitly uses the term "may," not "shall." Second, the Group points out that the jury was instructed in accordance with Section 1630.2(*o*)(3)'s language and that the jury could have found from the evidence presented that the Group's failure to suggest additional options did not constitute a failure to provide reasonable accommodations. Conceding at oral argument that the employer may in some situations have specialized knowledge or be otherwise better situated such that it would be required to suggest accommodations in the first instance, the Group argues that the jury could reasonably conclude that this was not such a case.

The regulations' use of "may" clearly suggests that Congress, while it could have imposed an affirmative obligation upon employers in all cases, chose not to. That

---

**6.** For record support, Jacques points to his trial testimony as well as that of Buck and the Group's President, all of which demonstrate that the Group made absolutely no effort to find a reasonable accommodation or otherwise assist Jacques in determining whether one existed.

**7.** "Unless expressly stated otherwise, the standards applied in the ADA are not intended to be lesser than the standards applied under the Rehabilitation Act of 1973." 29 C.F.R. § 1630.1, App. (1995).

said, however, as the Seventh Circuit recently observed, "someone, either the employer or the employee, bears the ultimate responsibility for determining what specific actions must be taken by the employer," *Beck v. University of Wis.*, 75 F.3d 1130, 1135 (7th Cir.1996), and 29 C.F.R. § 1630.2(*o*)(3) indicates that "[t]he employer has at least some responsibility in determining the necessary accommodation . . . [and that] the regulations envision an interactive process that requires participation by both parties." *Id.* The Fifth Circuit made a similar observation even more recently: "Once the accommodation is properly requested, the responsibility for fashioning a reasonable accommodation is shared between the employee and the employer." *Taylor*, 93 F.3d at 165 (stating that the "employee's initial request triggers employer's obligation to participate in interactive process" and that employer cannot be held liable for failing to provide one if employee fails to request an accommodation.); *cf. White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir.1995) (noting that interactive process is triggered only after employer makes threshold determination that disabled employee may be accommodated).[8]

That said, based upon our standard of review, this appeal begins and ends with the reasonableness of the jury's verdict: we simply cannot conclude that reasonable persons, looking at the evidence in the light most favorable to the Group, and according it all reasonable inferences could not have found for the Group. *See Gallagher v. Wilton Enterprises, Inc.*, 962 F.2d 120, 124 (1st Cir. 1992); *Chedd–Angier Production Co., Inc. v. Omni Publications Intern., Ltd.*, 756 F.2d 930, 934 (1st Cir.1985). In other words, we agree with the Group that the jury could have found from the evidence presented that the Group's failure to suggest additional options did not constitute a failure to provide reasonable accommodations.

> The jury was correctly instructed that
> it may be necessary for the employer to initiate a discussion with the employee about appropriate accommodations. . . .
> Unlawful discrimination occurs when the

employee's . . . opportunities with respect to . . . right of return from layoff, rehiring and job assignment are adversely affected because of his disability or because the employer failed to make a reasonable accommodation.

Tr. Trans. Vol. IV at 388–89. Jacques objected to the court's refusal to instruct the jury that if it were to find that the Group failed to give him a reasonable accommodation then it would not need to go any further as this failure itself constituted intentional discrimination but did not object on the grounds that the instruction misstated the law. Nor does he make such a claim or otherwise challenge the district court's instruction on appeal.

Given its instructions and the evidence presented, the jury could have reasonably concluded that the Group's failure to initiate an interactive process or suggest alternatives did not constitute a *per se* failure to provide reasonable accommodations here. The jury reasonably could have concluded that engaging in an interactive process simply was *not* necessary in order to determine the appropriate reasonable accommodation. Not only was there substantial evidence from which to conclude that Jacques (an intelligent and well-educated individual who had always managed to make his own way to job sites in the past) was just as well situated, if not better so, to investigate and suggest other alternatives, but the jury reasonably could have concluded that Jacques was simply unwilling to fulfill the essential function of the Arena assignment: as we already noted, Jacques never explained why the extra half mile precluded him from getting to the Arena assignment on his own or why he was otherwise unwilling to travel that extra distance. *Cf. Taylor*, 93 F.3d at 164–65 (noting that employee failed to fulfill burden of adducing summary judgment evidence showing that he told employer that he was limited as a result of his disability); *Buckingham*, 998 F.2d at 742 (noting on remand that employee may meet burden by showing, *inter alia*, that

---

**8.** Neither party cited any of these ADA cases. Even though *Taylor* was decided after oral argument, neither party filed a supplemental letter pursuant to Fed. R.App. P. 28(j).

accommodation sought is *necessary* to enable performance of essential function).[9]

Furthermore, apart from his investigation into bus routes, Jacques presented no evidence that he requested any other accommodations, inquired whether the Group had any suggestions, or otherwise indicated that he was still interested in finding a solution. Cf. *Taylor,* 93 F.3d at 164–65 (noting that responsibility for fashioning accommodation is shared between employer and employee). While it is uncontroverted that the Group did not suggest any alternative accommodations after it rejected as unreasonable Jacques' proposed accommodations, there is no evidence that the Group failed to consider Jacques' requested accommodations and "there is nothing in the record from which we can discern any attempt by the [Group] to sweep the problem under the rug." *Beck,* 75 F.3d at 1136 (affirming summary judgment in favor of employer under the ADA where employee was responsible for breakdown in interactive process to determine reasonable accommodation); *cf. Butler,* 595 F.Supp. at 1067 (noting that there must be some sufficient connection between the loss of the protected interest, the job, and the violation of the duty owed to the employee).

Indeed, just as the jury reasonably could conclude that Jacques did not need reasonable accommodation in order to perform the essential functions, the Group quite reasonably could have interpreted Jacques' unexplained refusal to travel the additional half-a-mile as an implicit refusal of the Arena assignment and preference to wait for a more convenient assignment to become available. As Macomber testified, Jacques "rode his bike to [the] office every single day, and the ice [A]rena was not much further. That's the reason [why] I offered him the job." In fact, trial testimony that the Group filed in opposition to Jacques' application to the Maine Department of Labor for partial unemployment on the basis that he refused the Arena assignment suggests that this is pre-

cisely how the Group interpreted the situation.

Of course, we are painfully aware that the Group's failure to engage in an informal interactive process with Jacques regarding accommodation options beyond those which he requested results from its failure to be properly informed of its obligations under the ADA. Nevertheless, the Group is spared from walking the plank given that we cannot conclude under our circumscribed review of the jury's verdict—evaluating the evidence with our "eye[s] toward determining whether it can support only one outcome," *Sánchez v. Puerto Rico Oil Co.,* 37 F.3d 712, 716 (1st Cir.1994)—that no reasonable jury could have reached the verdict reached below.

The ADA represents a major commitment by the federal government to assure adequate protection to Americans with disabilities. There may well be situations in which the employer's failure to engage in an informal interactive process would constitute a failure to provide reasonable accommodation that amounts to a violation of the ADA. But cases involving reasonable accommodation turn heavily upon their facts and an appraisal of the reasonableness of the parties' behavior. The jury verdict in this case was not irrational, the jury instructions were not subject to objection, and we leave more difficult cases to another day.

## V. EVIDENTIARY RULING

■ Jacques also argues that the district court abused its discretion when it admitted into evidence the March 3 letter in which Jacques made disparaging statements about the Group. If this were a case about discrimination occurring upon termination, Jacques maintains, the letter's admission would be justified; however, because the discrimination occurred upon Jacques' return from layoff—one week before the aggressive and inflammatory letter was written—the probative value of the letter is highly ques-

---

9. We recognize that, even when qualified employees are able to perform a job's essential functions, employers may not be relieved of their duty to accommodate where accommodations are required to allow equal enjoyment of employment privileges and benefits or to pursue therapy

or treatment. *See Buckingham,* 998 F.2d at 740–41. This, however, does not assist Jacques as he presented no evidence that he required accommodation in order to enjoy equal privileges and benefits or to pursue therapy or treatment for his epilepsy.

tionable. Because of this, Jacques continues, and because the letter served merely to reflect upon his character and to arouse the jury's hostility, it should have been excluded due to its "extreme prejudicial nature."

 As Jacques points out, "[e]vidence having a dual tendency, inadmissible and gravely prejudicial for one purpose but not objectionable for another if separately considered, should be excluded from the jury where the feat of ignoring it in the one aspect while considering it in the other is too subtle for the ordinary mind and the risk of confusion is so great as to upset the balance of practical advantage." *Shepard v. United States*, 290 U.S. 96, 103, 54 S.Ct. 22, 25–26, 78 L.Ed. 196 (1933). Be that as it may, Jacques' counsel failed not only to object on any grounds other than relevance but also to request a limiting instruction. As counsel never moved beyond relevancy to argue unfair prejudice under Fed.R.Evid. 403, we review Jacques' claim of error under Rule 403 only for plain error pursuant to Fed.R.Evid. 103,[10] recognizing while we do so that "Rule 403 is a liberal rule under which relevant evidence generally is admitted." *United States v. McMahon*, 938 F.2d 1501, 1508 (1st Cir.1991); *Dente v. Riddell, Inc.*, 664 F.2d 1, 5 (1st Cir.1981) ("A trial judge has much latitude in these matters.").

It was clearly not plainly erroneous to admit the letter on the basis that its probative value outweighed its prejudicial effect. While the letter does not frame Jacques in a flattering light, it was certainly not without relevance. In response to Jacques' relevancy objection, the Group replied below that the March 3 letter was relevant as it tended to show that the Group did not intentionally discriminate against Jacques in making its decision to terminate and failure to rehire. The court agreed, noting that "if the jury finds it was the disability which was the cause of termination first, they have to find that and that's discriminatory.... If there were other reasons, it's a factual finding for the jury."[11] Even though the letter was written after the alleged discrimination regarding Jacques' return from layoff, it was still relevant as it also tended to show that Jacques was an intelligent, educated and resourceful individual. It also was probative as to his credibility. Even were we to assume that the magistrate judge was faced with a "close call" given the letter's prejudicial propensity, *see* Fed.R.Evid. 403, we nonetheless would find no plain error. Not only do we find that the probative value of the letter is not "substantially outweighed" by any unfair prejudice, but we would strike the Rule 403 balance in favor of admission. *McMahon*, 938 F.2d at 1508.

## VI. CONCLUSION

For the foregoing reasons, the decision below is *affirmed.*

---

10. Fed.R.Evid. 103 provides, in pertinent part: "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected.... In case the ruling is one admitting evidence, a timely objection or motion to strike appears on the record, stating the specific ground of objection, if the specific ground for the objection is not apparent from the context."

11. Relying on *John McShain, Inc. v. Cessna Aircraft Co.*, 563 F.2d 632, 635 (3d Cir.1977),

Jacques also faults the district court's articulation of factors used in balancing the probative value and prejudicial effect of the evidence. *Id.* ("The substantiality of the consideration given to competing interests (potential prejudice and probative value) can best be guaranteed by an explicit articulation of the trial court's reasoning."). Because Jacques failed to raise the issue of prejudicial effect below, we also review this for plain error. We find none.