# United States Court of Appeals
## For the First Circuit

---

No. 00-2347

SIMONNE PHELPS,

Plaintiff, Appellant,

v.

OPTIMA HEALTH, INC. AND
CATHOLIC MEDICAL CENTER,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

---

Before

Torruella, Chief Judge,

Bownes, Senior Circuit Judge,

and Boudin, Circuit Judge.

---

Sheila O. Zakre, was on brief, for appellant.
David W. McGrath, with whom Peter S. Cowan and Sheehan Phinney
Bass + Green, P.A., were on brief, for appellees.

---

May 30, 2001

**TORRUELLA, Chief Judge.** Appellant Simonne Phelps claims that she was dismissed from her nursing position at the Catholic Medical Center (CMC)[1] in violation of Title I of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., and § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).[2] The district court ruled on summary judgment that Phelps was not a "qualified individual with a disability" because she could not perform the "essential functions" of her job "with or without reasonable accommodation." Phelps v. Optima Health, Inc., Civ. No. 99-227-JD, 2000 WL 1513782 (D.N.H. Sept. 15, 2000). We affirm.

## BACKGROUND

The following facts are summarized in the light most favorable to the appellant. Greenwald v. Chase Manhattan Mortgage Corp., 214 F.3d 76, 78 (1st Cir. 2001). Phelps worked as a staff nurse for CMC from 1979 until 1983, at which point she injured her back at work and, as a result, discontinued employment there. Since then, she has been restricted from lifting more than fifteen to twenty pounds at a time. In 1989, CMC rehired Phelps as a "per diem relief nurse" in the rehabilitation unit. Because Phelps's disability prevented her from performing the normal tasks of a staff nurse, the manager of the

---

[1] Appellee CMC is a subsidiary of appellee Optima Health, Inc. (Optima).

[2] Claims under Title I of the ADA and § 504 of the Rehabilitation Act are analyzed under the same standards. EEOC v. Amego, Inc., 110 F.3d 135, 143 (1st Cir. 1997).

-3-

rehabilitation unit, Lorraine Simon, created the unique position of "medication nurse" for her. As a medication nurse, Phelps was primarily responsible for the delivery of medicine, as well as for other tasks that did not involve lifting heavy objects.

As a result of a temporary shortage of nurses, Phelps stopped being a medication nurse and began to undertake some patient care in early 1995. Phelps remained unable to fulfill all the duties of a typical staff nurse, so she shared a patient load with her sister, Suzanne Lemire (who was also employed as a nurse in the rehabilitation unit at CMC). If Lemire was unavailable or otherwise occupied, other nurses would undertake lifting tasks. Although this job-sharing arrangement was never officially reported to either the Employee Health Department or the Human Resources Department at CMC, it was unofficially approved by Simon.

In June of 1997, Jeanne Wolfendale replaced Simon as the nurse manager for the rehabilitation unit. Wolfendale asked Phelps to provide a more recent physician's report on the extent of her physical restrictions. The report indicated that Phelps could lift twenty pounds frequently, but was unable to lift fifty pounds at all.[3] Wolfendale concluded that, lacking the ability to lift fifty pounds, Phelps was unable to perform the essential functions of the clinical

---

[3] Phelps later conceded that she had asked the doctor for an optimistic evaluation of her physical limitations; in actuality, she could lift twenty pounds only "occasionally" rather than "frequently."

nurse position. Phelps was therefore dismissed from her position in the rehabilitation unit on October 27, 1997, but remained employed by CMC.

Immediately after Phelps was notified of her removal from the rehabilitation unit, she met with human resources manager Vicki L'Heureux. L'Heureux reviewed the available positions both at CMC and elsewhere in the Optima system, explained the application process for an internal transfer to a new position, and offered to help Phelps find a new position that was compatible with her physical limitations. Phelps indicated that any position would have to have the same flexibility as to scheduling and the same level of pay that she had at the rehabilitation unit. CMC terminated Phelps on February 25, 1998, without having employed her in a new position.

## DISCUSSION

To state a prima facie claim of disability discrimination under the ADA, a plaintiff must prove by a preponderance of the evidence that: (1) she was disabled within the meaning of the ADA; (2) she was a qualified individual; and (3) she was discharged because of her disability. Ward v. Mass. Health Research Inst., Inc., 209 F.3d 29, 32-33 (1st Cir. 2000). The parties agree that Phelps was disabled within the meaning of the ADA (so we need not decide the issue) and that she was discharged because of her disability. However, appellees

argue, and the district court held, that Phelps was not a qualified individual under the ADA.

A qualified individual under the ADA is one "able to perform the essential functions of [her position] with or without reasonable accommodation." Id. at 33. Our analysis of whether an individual is qualified occurs in two steps: first, whether the individual can perform the essential functions of her position; and second, if she is unable to perform those essential functions, whether any reasonable accommodation by her employer would allow her to do so. Id.

## A.  Lifting as an Essential Function of Phelps's Position

The district court held that the ability to lift fifty pounds on a consistent basis was an essential function of the clinical nurse position.  Phelps does not disagree with this determination, nor does she suggest that the court erred in its conclusion that she was unable to lift that amount of weight on a consistent basis.  Instead, she argues that she was not technically a clinical nurse, but that she held a nursing position that had been created specifically for her physical limitations.  The district court found no evidentiary support for such an argument:  "It appears to be undisputed that Phelps was working in a clinical nurse I position, shared with her sister, at the time her employment was terminated." Phelps, 2000 WL 1513782, at *3.  The evidence overwhelmingly supports the district court's conclusion.

-6-

First, Phelps testified that she was no longer a medication nurse at the time of her termination, and that although she had not considered what her job description was at the time of her termination, she "assume[d] [that she] was a staff RN." Phelps then indicated that the technical job description "clinical nurse I" was essentially synonymous with the shorthand "staff nurse."[4] Second, CMC Human Resources Manager Mary Ann Flatten testified that Human Resources had to approve changes to job descriptions or the creation of new positions. It is undisputed that Human Resources never approved, nor was even aware of, the altered nurse position that Phelps describes. All of the differences between her position and that of the other nurses were a result of understandings between Phelps, Simon, and other nurses in the rehabilitation unit, and none were in writing. Third, Phelps testified that there were occasions in which nurses other than her sister had to assist her in nursing duties. The fact that Phelps and Lemire would occasionally work on different shifts suggests that there was no formal and permanent job-sharing arrangement. In short, the evidence clearly indicates that Phelps held the position of clinical nurse, albeit with unwritten modifications aimed at allowing her to fulfill most job duties despite her disability.

---

[4] After reading the written job description for clinical nurse I, Phelps testified that "a lot of it [was] very familiar to [her] because that's what an RN does [; i.e., the responsibilities described] are the normal functions of an RN [in] the [rehabilitation unit]."

Although this Court has not yet addressed the issue, several other courts have indicated that -- even when an employer and employee have made arrangements to account for the employee's disability -- a court must evaluate the essential functions of the job without considering the effect of the special arrangements. See, e.g., Basith v. Cook County, 241 F.3d 919, 930 (7th Cir. 2001) (delivery of medicine remained essential function of job despite special assignment allowing employee not to deliver medicine for period of time); Pickering v. City of Atlanta, 75 F. Supp. 2d 1374, 1378-79 (N.D. Ga. 1999) (temporary assignment of prison guard to "light duty" because of her disability does not change essential functions of prison guard position). The fact that an employee might only be assigned to certain aspects of a multi-task job does not necessarily mean that those tasks to which she was not assigned are not essential. Anderson v. Coors Brewing Co., 181 F.3d 1171, 1175-76 (10th Cir. 1999) (relevant functions are those of "TPO" position for which employee was hired, as opposed to can-sorter position to which she was assigned); Miller v. Ill. Dep't of Corr., 107 F.3d 483, 485 (7th Cir. 1997) (essential functions of prison guard position included all functions required of prison guards, even when plaintiff had been allowed to rotate only between certain assignments).

Phelps's basic counter-argument is that the accommodations offered by Simon, her sister, and the rest of the nursing staff

-8-

distinguished the essential functions of Phelps's position from those of the other nurses; i.e., that for Phelps's nursing position alone, lifting was <u>not</u> an essential function.  However, we agree with the Seventh Circuit that evidence that accommodations were made so that an employee could avoid a particular task "merely shows the job could be restructured, not that [the function] was non-essential."  <u>Basith</u>, 241 F.3d at 930.  To find otherwise would unacceptably punish employers from doing more than the ADA requires, and might discourage such an undertaking on the part of employers.  <u>See</u> <u>Laurin</u> v. <u>Providence Hosp.</u>, 150 F.3d 52, 60-61 (1st Cir. 1998); <u>Sieberns</u> v. <u>Wal-Mart Stores, Inc.</u>, 125 F.3d 1019, 1023 (7th Cir. 1997); <u>Holbrook</u> v. <u>City of Alpharetta</u>, 112 F.3d 1522, 1528 (11th Cir. 1997); <u>Vande Zande</u> v. <u>Wis. Dep't of Admin.</u>, 44 F.3d 538, 545 (7th Cir. 1995).  In short, even though her co-workers had allowed Phelps to avoid having to lift more than fifty pounds, the ability to do so remained an essential function of her position.

**B.  Reasonable Accommodation**

Having found that the ability to lift fifty pounds was an essential function of the position held by Phelps at the time of her termination, we next ask whether any reasonable accommodation on the part of her employer would allow Phelps to perform that function. <u>Feliciano</u> v. <u>Rhode Island</u>, 160 F.3d 780, 786 (1st Cir. 1998).  The burden  is  on  Phelps  to  show  the  existence  of  a  reasonable

accommodation. Id. (citing Barnett v. U.S. Air, Inc., 157 F.3d 744, 748-49 (9th Cir. 1998)). She has not done so.

First, appellant contends that it would have been a reasonable accommodation to allow her to continue sharing patient lifting duties with other nurses. Although a reasonable accommodation may include job restructuring, 42 U.S.C. § 12111(9)(B), an employer need not exempt an employee from performing essential functions, nor need it reallocate essential functions to other employees. Feliciano, 160 F.3d at 785; Soto-Ocasio v. Fed. Express Corp., 150 F.3d 14, 20 (1st Cir. 1998). Appellees therefore did not have to allow Phelps to engage in job-sharing as a reasonable accommodation. The fact that appellees previously allowed Phelps to engage in a job-sharing arrangement does not obligate them to continue providing such an accommodation. See, e.g., Laurin, 150 F.3d at 60-61; Holbrook, 112 F.3d at 1527. Again, to find otherwise would discourage employers from granting employees any accommodations beyond those required by the ADA. Laurin, 150 F.3d at 60-61.

Second, Phelps suggests that it would have been a reasonable accommodation for appellees to allow her to return to her medicine nurse position. Reasonable accommodation may include "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B); Feliciano, 160 F.3d at 786; Criado v. IBM Corp., 145 F.3d 437, 443 (1st Cir. 1998). However, appellant bears the burden of proof in showing that such a vacant

-10-

position exists. <u>Feliciano</u>, 160 F.3d at 786-87. The only testimony in the record indicated that the position no longer existed in 1997; that evidence was sufficient for summary judgment in favor of appellees. An employer is not required by the ADA to create a new job for an employee, nor to re-establish a position that no longer exists. <u>Hoskins</u> v. <u>Oakland County Sheriff's Dep't</u>, 227 F.3d 719, 730 (6th Cir. 2000); <u>Aka</u> v. <u>Wash. Hosp. Ctr.</u>, 156 F.3d 1284, 1305 (D.C. Cir. 1998); <u>Hendricks-Robinson</u> v. <u>Excel Corp.</u>, 154 F.3d 685, 697 (7th Cir. 1998).

## C.  The Interactive Process

Phelps also argues that she was denied the opportunity to investigate other vacant positions for which she was qualified because appellees failed to engage in an interactive process to determine appropriate accommodation.  Although the EEOC regulations that implement the ADA do not mandate that an employer provide an interactive process, <u>see</u> <u>Jacques</u> v. <u>Clean-Up Group, Inc.</u>, 96 F.3d 506, 513-14 (1st Cir. 1996), they do suggest that "it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual," 29 C.F.R. § 1630.2(o)(iii).  We have said that "[t]here may well be situations in which the employer's failure to engage in an informal interactive process would constitute a failure to provide reasonable accommodation that amounts to a violation of the ADA." <u>Jacques</u>, 96 F.3d at 515.  However, even if a fully realized interactive process would have been successful in finding a new

position for Phelps,[5] she concedes that it was she who failed to cooperate in such a process.[6] See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 311 (3d Cir. 1999) (both parties have duty to engage in

---

[5] The district court did not evaluate the quality of the interactive process at any great length because it concluded that Phelps had not met her burden of showing that a vacant position for which she was qualified existed. Phelps, 2000 WL 1513782, at *5; see also Donahue v. Consol. Rail Corp., 224 F.3d 226, 233 (3d Cir. 2000) ("[I]t falls to the employee to make at least a facial showing that there were vacant, funded positions whose essential functions he was capable of performing.") (quoting Jones v. United Parcel Serv., 214 F.3d 402, 407 (3d Cir. 2000)); Cravens v. Blue Cross & Blue Shield, 214 F.3d 1011, 1021 (3d Cir. 2000) (placing such a burden on the plaintiff).

[6] We reproduce here the relevant deposition testimony indicating Phelps's lack of good faith in participating in the interactive process:

> Q: "Do you recall [L'Heureux] telling you that you shared some responsibility for trying to find you a new position in the system?"
>
> A: "Correct."
>
> Q: "Did you agree with that?"
>
> A: "No, I didn't."
>
> Q: "You felt it was strictly up to the hospital to find a place for you?"
>
> A: "I felt they displaced me and it was their job to find another position within the hospital facility."
>
> Q: "So you didn't feel like you had an obligation to interact with them in that process?"
>
> A: "Not in this situation. I didn't ask to be terminated."
>
> Q: "And so you didn't interact with them in this process?"
>
> A: "Correct."

interactive process in good faith); Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1135-37 (7th Cir. 1996) (employee's unwillingness to cooperate in interactive process prevents them from premising liability on its failure); see also Jacques, 96 F.3d at 514 (citing Beck and Taylor with approval). Evidence of the details of Phelps's post-dismissal conversations with human resources personnel confirms that Phelps was not actively engaged in the interactive process: she turned down several job opportunities suggested by L'Heureux and placed significant conditions on her reassignment severely limiting CMC's flexibility. Moreover, the evidence indicates that CMC offered Phelps several potential alternatives, began the interactive process immediately after Phelps's dismissal,[7] returned her phone calls and letters promptly, and generally acted in good faith. We therefore cannot find that the lack of success of the interactive process in this case creates any liability under the ADA. See Beck, 75 F.3d at 1137 ("Liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for

_____

[7] Phelps partly premises her argument on the fact that she was dismissed from the rehabilitation unit on October 27, 1997, immediately prior to meeting with human resources personnel. She asserts that, once she had been dismissed, CMC could not have engaged in a true interactive process eventually leading to a new position because Phelps was no longer employed. However, although Phelps was dismissed from the rehabilitation unit in October of 1997, she was not terminated as a CMC employee until February of 1998. We cannot say that appellees' decision to remove Phelps from a job which she was physically incapable of performing, without actual termination of her employment, constitutes a failure to engage in the interactive process.

-13-

the breakdown.  But where, as here, the employer does not obstruct the process, but instead makes reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed, ADA liability simply does not follow.").

**CONCLUSION**

Phelps has not presented sufficient evidence to meet her burden of showing that she could perform the essential functions of her position, with or without reasonable accommodation.  The grant of summary judgment is **affirmed.**