KAYATTA, Circuit Judge,
dissenting.
A reasonable jury could properly view the facts in this case very differently than does the majority. So viewed, those facts should preclude summary judgment unless we are to bless as a matter of law a negotiating tactic that is unfair to disabled employees who reasonably believe that they confront imminent serious harm if an accommodation is not provided. To explain why this is so, I begin with a brief example of how a reasonably competent plaintiffs lawyer would fairly describe the well-supported facts to a jury, and I then follow with an analysis of why those facts could support a verdict in EEOC’s favor. Finally, I explain why it follows that the constructive discharge claim should survive as well.
I. The Facts
Fending off the stress-induced exacerbation of a life-threatening condition, and believing that she faced imminent serious harm if she could not secure an accommodation, Manning requested less erratic work hours — especially no swing shifts — to allow her to work without suffering harmful medical consequences. Kohl’s demanded that Manning provide a note from her doctor, which she then did. Dr. Brodsky’s note focused on the problem caused Manning by swing shifts in particular. He explained that, as someone with type 1 diabetes, Manning “takes five daily injections of insulin that must be timed to match her meals and activity,” but that she was “having difficulty matching her insulin action to her work schedule in your store when she swings shifts (e.g. working late shift one day and returning for an early shift the next day).” Dr. Brodsky’s note further informed Kohl’s that “[a] more predictable and regular schedule should help smooth her blood sugar control and help prevent serious complications of diabetes.” Although the note referenced, parenthetically, 9:00 a.m. to 5:00 p.m. and 10:00 a.m. to 6:00 p.m. shifts, a fact-finder could reasonably conclude that the doctor offered those shifts simply as acceptable examples, and that Manning merely requested a consistent day-to-day schedule as a way of avoiding swing shifts. The district court therefore properly operated on the premise that Manning’s request was for a “more regular and predictable schedule,” somewhere between the hours of 6:00 a.m. and 8:00 p.m., that did not include *136 swing shifts.[10]
Manning repeated her request for a steady work schedule and no swing shifts during the meeting with store manager Carr and assistant store manager Barnes. In response, Carr and Barnes left Manning with the impression that no individual accommodation would be forthcoming. Specifically, Carr told Manning that if she gave Manning the scheduling accommodation Manning wanted, then she would have to do that for everyone else at the store. Barnes reinforced this point by telling Manning that “we were keeping to consistency in regards to all full timers in the building and their schedules.” Carr further explained that “the needs of the business dictate[d] when [Manning] work[ed]” and “would require at times shifts that are early, days, mids and closes.” These statements, taken together, basically told Manning that Kohl’s would not offer Manning any scheduling accommodation that was not both available to all other workers and compatible with a business need to have fluctuating shifts.[11] As a concrete demonstration of this point, Carr and Barnes flatly rejected the accommodation Manning requested and, importantly, offered her no alternative accommodation even though Kohl’s — through HR manager Treichler — had already expressly authorized Carr to offer Manning a schedule with no swing shifts, the availability of which did not turn on its being offered to all other employees as Carr falsely told Manning.
With a vulnerable employee known to Kohl’s to believe she faced imminent harm if her shifts could not be changed, the negotiating tactics employed by Carr and Barnes caused Manning to flee the one-sided discussions and announce that she had no choice but to quit. It is true that Carr chased after Manning and spoke with her in the break room, and then called her again ten days later. But in neither conversation did Carr propose alternative accommodations, request other information, or otherwise indicate that Kohl’s had relented. In the break room, Carr failed to suggest any accommodation, including the accommodation that Carr knew she could offer and that Manning’s doctor said she most needed-no swing shifts. During the second conversation, by phone on April 9, Manning asked about her work schedule after Carr asked her to consider other accommodations for full-time and part-time employment (none of which Carr actually offered, or even said she had authority to offer).[12] Carr replied that she would *137 need to consult with the corporate office about any schedule accommodations, in contradiction with the corporate office’s earlier authorization for Carr to avoid scheduling Manning for swing shifts. Four times unable to get a specific counteroffer from Kohl’s of any accommodation, and told that the person she was speaking to didn’t even have any authority to offer one, Manning gave up and moved on.
II. The Interactive Process
My colleagues point to nothing in the foregoing presentation of the evidence that lacks support in the record. They nevertheless conclude that Manning forfeited her rights under the ADA because she was not more resilient in the face of Kohl’s negotiating tactics. This conclusion misapprehends the nature of the interactive process. While Kohl’s approach (as described by Manning) might be well-suited in some hard-edged business or diplomatic negotiations, it fits poorly with the type of “good faith,” “interactive process” that the applicable regulations require here. 29 C.F.R. § 1630.2(o )(3)[13]; see Enica v. Principi, 544 F.3d 328, 339 (1st Cir.2008). The EEOC’s interpretive guidance directs employers to use a “problem solving approach” to identify reasonable accommodations in consultation with the employee. 29 C.F.R. app. § 1630.9.[14] Pursuit of this problem-solving approach requires that the employer, once it becomes aware of the disability of an employee, “engage in a meaningful dialogue with the employee to find the best means of accommodating that disability.” Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 108 (1st Cir.2005). Interactive discussions should involve “a flexible give-and-take with the disabled employee so that together they can determine what accommodation would enable the employee to continue working.” EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 805 (7th Cir.2005). Here, Kohl’s did not give even what it could easily give.
Accepting as we must for summary judgment purposes the foregoing presentation of the facts — all well-supported by competent proof in the record — it seems most unfair to say that Manning forfeited her rights under the ADA. Manning communicated to Kohl’s the fact that she was disabled, she provided specific medical evi *138 dence describing how the swing shifts threatened her health, and she proposed a specific but flexible accommodation. In other words, she did everything necessary to enable Kohl’s to determine whether any accommodation was reasonably possible. Cf. Griffin v. United Parcel Serv., Inc., 661 F.3d 216, 225 (5th Cir.2011) (employee failed to provide information to show that his requested accommodation was necessary to manage his diabetes). Indeed, Kohl’s did determine that an accommodation was possible; it simply never offered it.
The obligation to engage in the interactive process in good faith arises out of a need to see to it that an employer receives the information necessary to determine whether an accommodation is needed, and why. See 29 C.F.R. app. § 1630.9. Kohl’s had all that information, and required nothing more (including Manning’s agreement) to offer that which it had already determined it could accommodate. The majority seems to conclude that because Treichler did not authorize Carr to offer Manning the most favorable accommodation of “a predictable day shift,” Carr’s failure to at least offer Manning “no swing shifts” is not evidence of lack of good faith. In the majority’s words,' Carr did not refuse “to extend a requested reasonable accommodation that she had been authorized to give” (emphasis added). There are two problems with this argument.
First, on this record, a jury might well conclude that Kohl’s actually understood that the key thing Manning needed and that she sought was consistency in the form of no swing shifts. Dr. Brodsky’s note clearly emphasized the problem swing shifts posed for Manning’s blood sugar control. Indeed, Treichler’s response to Carr shows that he at least interpreted the doctor’s note as requesting no swing shifts: “Clearly we can not [sic] have her not work nights. BUT, we can work with her to avoid the ‘swing shifts’ — A [sic] close followed by an open.” And Carr documented in an email that Manning asked her simply, and generally, “why she couldn’t have a more day to day consistent schedule.”
Second, let’s assume that the majority is correct, i.e., that Manning’s request could only be interpreted as a request for something more than no swing shifts, and that Treichler only authorized Carr to offer an end to swing shifts. The fact remains, Carr never offered anything, and (if Manning is to be believed) a jury could find that Carr and Barnes actively misled Manning into believing that they could offer no accommodation that was not consistent with the schedules of “all full timers” or available to everyone else. I would think that a jury could find that such tactics fell far enough short of “good faith” participation in an “interactive,” “problem solving” process so as to place on Kohl’s some of the blame for the breakdown of that process. Instead, the majority rewards Kohl’s for withholding even the accommodation it could make — and misrepresenting its availability — by declaring that Kohl’s wins the whole case as a matter of law. All the employer now need do is keep its lips moving, not offer anything, imply that it cannot offer what even it determines it clearly can, and hope that the employee becomes disheartened enough to give up.
The majority’s language betrays a failure to focus on the role of a jury in this ease. The majority observes that Kohl’s negotiating tactics did not “necessarily amount to bad faith” (emphasis added), so long as it was “earnest.” I agree. Therefore the EEOC does not win on summary judgment. Why Kohl’s wins, though, is not explained. To be blunt, what exactly did Kohl’s say that could not be viewed as an empty gesture, or worse? Kohl’s had *139 two chances to offer no swing shifts, it never offered anything, and the party who did make an offer and supply requested information (Manning) loses as a matter of law?
It would therefore appear that the majority reserves a heightened judicial scrutiny for breakdowns in the interactive process only when the employee may have erred. In Jacques v. Clean-Up Group, Inc., 96 F.3d 506 (1st Cir.1996), the employer entirely failed to engage in any interactive process, apparently unaware of its obligation to do so, and claimed to have interpreted the employee’s request for an accommodation as an “implicit refusal” to accept a work assignment. Id. at 515. Our court acknowledged that it was “painfully aware that the [employer’s] failure to engage in an informal interactive process with [the employee] regarding accommodation options beyond those which he requested results from its failure to be properly informed of its obligations under the ADA.” Id. We nonetheless sustained a jury verdict for the employer, noting that “cases involving reasonable accommodation turn heavily upon their facts and an appraisal of the reasonableness of the parties’ behavior.” Id. Somehow, then, a reasonable jury could find that the oblivious employer in Jacques did not forfeit its rights, but, according to the majority in this case, no reasonable jury could find that Manning preserved hers. And this is apparently so even though Kohl’s, like the employee in Jacques, “was just as well situated, if not better so, to investigate and suggest other alternatives.” Id. at 514.
Certainly no precedent compels the hard-edged view adopted by the majority as a pronouncement with which no jury could reasonably disagree. In exonerating the employer in Tobin, our court stated that “[t]his is not an instance where the employer ... simply rejected any request for accommodation without further discussion.” Tobin, 433 F.3d at 109. Unlike the “great deal of discussion” and “significant action on the part of company officials” in Tobin, id., a jury could find in this case that Kohl’s discussed only in form, not substance, and did not act at all.
Instead, Kohl’s approach is closer to that of the employer in Colwell v. Rite Aid, 602 F.3d 495 (3d Cir.2010). There, the employer’s manager rejected the requests of a partially blind employee, who could not drive at night, to be scheduled for daytime shifts only. Id. at 498-99. The Third Circuit concluded that the manager’s subsequent agreement to a meeting with an employee, without more, would not compel a jury to find that the employer was willing to negotiate in good faith after the manager “had flatly refused all of [the employee’s] overtures,” and the employer “d[id] not assert that [the manager] was willing to offer any accommodations,” even though the employee quit before the meeting. Id. at 507-08; see also Sears, Roebuck & Co., 417 F.3d at 806 (“The last act in the interactive process is not always the cause of a breakdown ... and courts must examine the process as a whole.... ”).
The majority quotes Enica and Phelps for the proposition that “the process requires open communication by both parties, and an employer .will not be held liable if it makes ‘reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed.’ ” Enica, 544 F.3d at 339 (quoting Phelps v. Optima Health, Inc., 251 F.3d 21, 28 (1st Cir.2001)). A jury could certainly find that Kohl’s did not make reasonable efforts to provide accommodations based on the information it possessed. Indeed, it did not even make a reasonable effort to provide the accommodation it knew it could provide. By contrast, in Phelps the employer actually *140 offered several potential alternative accommodations, and the employee conceded that she refused to participate in the interactive process. Phelps, 251 F.3d at 27-28. Likewise, in Enica the employer did offer and agree to several accommodations during months of back-and-forth with the employee. Enica, 544 F.3d at 340-42. Kohl’s, however, offered nothing.
III. The Constructive Discharge
Because a reasonable jury could find that Manning reasonably believed that no accommodation was forthcoming or possible, and that further work without an accommodation posed a serious health risk, a jury that found Kohl’s could have reasonably accommodated Manning’s needs could also conclude that Kohl’s constructively discharged Manning by not doing so. The lack of an accommodation made Manning’s working conditions “so difficult or unpleasant that a reasonable person in [her] shoes would have .felt compelled to resign,” resulting in constructive discharge. De La Vega v. San Juan Star, Inc., 377 F.3d 111, 117 (1st Cir.2004) (quotation marks omitted) (alteration in original). Manning’s doctor’s note is clear that the erratic work schedule “induce[d] additional stress and more sugar fluctuation” and that Manning’s “diabetes control ha[d] recently deteriorated and exhibited] a clear stress pattern.” That deterioration raised the prospect of ketoacidosis or a coma. Kohl’s unwillingness to give Manning a predictable schedule subjected Manning to working conditions that threatened her health. Surely a jury could find such a threat sufficiently daunting as to compel Manning to defend herself by refusing to work without the required protection.
Although there may be cases in which an employer fails to accommodate but does not constructively discharge an employee, as when working without an accommodation does not jeopardize the employee’s health, here Manning’s work schedule put her in harm’s way. The “choice” between working a schedule that exacerbates a serious medical condition and resigning is not really a choice at all, and certainly not one that employees should have to make. See Torrech-Hernández v. Gen. Elec. Co., 519 F.3d 41, 50 (1st Cir.2008) (“[I]n order for a resignation to constitute a constructive discharge, it effectively must be void of choice or free will.”).
IV. Conclusion
As best as I can tell, this is the first time that any circuit court has held that an employer can reject an accommodation request backed up by a doctor’s note, refuse to offer an accommodation that it has determined it can make, falsely claim that any accommodation must be offered to all workers whether disabled or not, and then declare the employee’s ADA rights forfeited when she gives up. Such a holding demands too much resilience and persistence on the part of a disabled and stressed-out employee, and takes away from jurors a task they are well-suited to perform. I respectfully dissent.

. Rather than focus on how Kohl’s may have reasonably interpreted Manning’s request, including Dr. Brodsky’s note, the majority asks the wrong question: How did Dr. Brodsky interpret his note at his later deposition? The majority then illogically declares that interpretation to be the reading that a jury must assume Kohl's actually adopted. In any event, as I explain in the body of this dissent, infra, a jury could easily find Kohl’s responsible for the breakdown in the interactive process not because it rejected Manning’s request (however interpreted), but because it failed to offer even the accommodation it determined it could make.

. The majority correctly notes that Kohl’s employees testified that full-time employees were required to work two night shifts per week and have “open availability,” or the flexibility to work any time of the day, although it appears that this scheduling expectation was not recorded in writing. However, there is also testimony in the record that exceptions to this scheduling practice were “pretty regularly” made, and "there was a fair amount of leeway within those [full-time] positions.” The district court therefore considered it disputed that open availability and working two night shifts per week were strict requirements for full-time employees.

.Although part-time employment can be a reasonable accommodation, 42 U.S.C. § 12111(9)(B), Kohl’s knew that it was not *137 the volume of work that jeopardized Manning’s health, but its erratic distribution.

. 29 C.F.R. § 1630.2(o)(3) provides that "[t]o determine the appropriate reasonable accommodation it may be necessary for the . covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.”

. The EEOC’s interpretive guidance on the ADA provides, in relevant part, that
When an individual with a disability has requested a reasonable accommodation to assist in the performance of a job, the employer, using a problem solving approach, should:
(1) Analyze the particular job involved and determine its purpose and essential functions;
(2) Consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation;
(3) In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position; and
(4) Consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the .employer.
29 C.F.R. app. § 1630.9.