Maria MOLINA, Plaintiff,

v.

DSI RENAL, INC., Defendant.

No. EP–11–CA–28–FM.

United States District Court,
W.D. Texas,
El Paso Division.

Jan. 4, 2012.

John A. Wenke, Attorney at Law, El Paso, TX, for Plaintiff.

Courtney M. Smith, Michael W. Fox, Ogletree Deakins Nash Smoak & Stewart PC, Austin, TX, for Defendant.

## REVISED ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT[1]

FRANK MONTALVO, District Judge.

On this day, the court considered Defendant DSI Renal, Inc.'s ("DSI") "Defendant's Motion for Summary Judgment" ("Motion for Summary Judgment") [ECF No. 16], filed September 19, 2011; Plaintiff Maria Molina's ("Molina") "Plaintiff's Response to Defendant's Motion for Summary Judgment" ("Response") [ECF No. 17], filed October 3, 2011; and "Defendant's Reply in Support of Motion for Summary Judgment" ("Reply") [ECF No. 18], filed October 17, 2011. After considering the parties' arguments, the applicable law, and the Record as a whole, the court will grant in part and deny in part DSI's Motion for Summary Judgment.

1. This Order supersedes the "Order Granting in Part and Denying in Part Motion for Summary Judgment" [ECF No. 19]. Changes consist of including a footnote inadvertently omitted and correction of several minor typographical errors.

2. See ECF No. 1–1.

3. See ECF No. 1.

## I. BACKGROUND

### A. Procedural History

Molina filed her "Plaintiff's Original Petition" ("Petition") in state court on November 19, 2010.[2] Molina's Petition alleges claims against DSI under the Texas Commission on Human Rights Act ("TCHRA"). Specifically, Molina brings claims (1) that DSI failed to provide her with a reasonable accommodation when the company prohibited her from working with medical restrictions; (2) that the company failed to provide her with a reasonable accommodation when it denied her additional medical leave; (3) that Molina's disability was a motivating factor in DSI's decision to terminate her; and (4) that DSI retaliated against Molina based on her EEO activity. On January 19, 2011, DSI removed the case to federal court on the basis of diversity jurisdiction.[3] DSI denies each of Molina's claims and now moves for summary judgment on all of her claims.

### B. Factual Background

Except where noted, the following facts are undisputed.

Molina is a certified medical assistant.[4] On or around April 2003, she began working at a dialysis clinic ("Clinic") in El Paso, Texas.[5] Jaime Loya ("Loya") was the manager of the Clinic[6] and Molina's supervisor.[7] Molina performed well at her job with only one patient complaint during her entire tenure at the Clinic.[8] In 2004 Molina began suffering from back pain, as well as head pain and tingling in her legs.[9]

4. Molina Dep. at 11.

5. Molina Dep. at 20.

6. Def.'s App. Ex. A at 1.

7. Molina Dep. at 20, 164.

8. Loya Dep. at 50–51, 102.

9. Def.'s App. at 5; Molina Dep. at 52, 165.

The pain varied in frequency and severity.[10] In 2005, Molina's doctor issued medical restrictions limiting her work hours and also restricting her from lifting over 20 pounds.[11] This restriction lasted at least two months.[12] Molina suffered a back injury in February 2006 and was restricted to working every other day and not lifting over 10 pounds.[13] On both occasions, Loya accommodated Molina's restrictions and allowed her to continue working.[14]

DSI acquired the Clinic in April 2006.[15] When DSI took over, all the employees, including Molina and Loya, retained their positions, and Molina's job duties did not change.[16] Molina worked 15 hour shifts and was generally scheduled to work on Mondays, Wednesdays, and Fridays.[17]

In September 2006 Molina's doctor again restricted her from lifting over 15 pounds due to her back injury.[18] This restriction lasted several months, and again Loya accommodated Molina and allowed her to continue working.[19] In May 2009, Molina had surgery on her kidneys and she was again restricted from working more than six hours a day and lifting over 20 pounds.[20] Loya was notified of these restrictions and allowed her to continue working.[21] In September 2009, Molina's back problems worsened.[22] She was referred to a specialist, who assessed her as having lumbago, lumbar internal disc derangement, and lumbar radiculopathy.[23] Molina's received an epidural injection on October 29, 2009.[24]

After this procedure, Molina returned to work on November 2, 2009.[25] At that time she provided Loya with a note from her doctor stating she was restricted from lifting more than 20 pounds and from extreme bending at the waist.[26] Molina also requested she be scheduled part time, and specifically that she be scheduled only on Mondays and Wednesdays.[27] Molina did not want to work on Fridays because she wanted to be available in case she needed additional epidural injections, which her doctor performed on Fridays.[28] Molina continued working with her lifting restriction, and Loya initially accommodated her scheduling request.[29] In December and January, however, he began to schedule her on days other than Mondays and Wednesdays.[30]

At some point, higher-level management at DSI learned that Loya was allowing

10. Molina Dep. at 52–53.

11. Loya Dep. at 53–54; Molina Dep. at 172; Exs. 31, 32.

12. Molina Dep. at 172.

13. Molina Dep. at 173–74; Ex. 33; Loya Dep. at 54.

14. Loya Dep. 54–55; Molina dep. At 101.

15. Def.'s App. Ex. A at 1.

16. Molina Dep. at 17; Loya Dep. at 47.

17. Molina Dep. at 22.

18. Molina Dep. at 176; Ex. 34.

19. Molina Dep. at 176; Loya Dep. at 56.

20. Molina Dep. at 170–171, Ex. 3.

21. Molina Dep. at 171.

22. *Id.* at 177.

23. Molina Dep. Ex. 35 at 3.

24. Molina Dep. at 57, 179.

25. Molina Dep. at 81.

26. Molina Dep. At 80–81.

27. Molina Dep. at 70–71, 77; Loya Dep. at 73–74; Def.'s App. Ex. K.

28. Molina Dep. at 71.

29. Molina Dep. at 185, 190; Loya Dep. at 88.

30. *Id.*

Molina to work with medical restrictions.[31] In mid-January 2010, Molina was called in to attend a conference call with Loya and Loya's supervisor, Sylvia Spencer ("Spencer"), DSI's Assistant Regional Vice President–Southwest Region.[32] During this conference, Spencer told Molina DSI was placing her on FMLA leave until she could return to work without her lifting restrictions.[33] While she was on leave, Molina stayed in touch with DSI's human resource office and updated it on her medical condition.[34] On January 13, 2010 Molina faxed a letter to DSI Human Resource Officer Melissa Monnin ("Monnin") objecting to being placed on forced medical leave because she was still able to perform her job duties.[35] In the letter, Molina explained she had previously been permitted to work with the same, or greater, restrictions, and expressed that she believed she was placed on medical leave as punishment for previously contacting HR.[36] Finally, Molina asked Monnin to investigate the situation and asked that she be permitted to return to work as soon as possible.[37]

Molina filed an EEOC charge on February 25, 2010.[38] On April 15, 2010, DSI sent Molina a letter notifying her that her FMLA leave had expired on April 2, 2010, and as she was not eligible for any other leave and could not return to work, her employment was terminated on April 3, 2010.[39]

Molina subsequently underwent surgery in May to replace two discs in her back.[40]

After recovering from surgery, on June 15, 2010 her doctor cleared her to return to work without restrictions.[41]

### C. Parties' Arguments

DSI contends summary judgment on Molina's claims for disability discrimination is warranted, because Molina cannot establish she is a qualified individual with a disability. DSI further argues it had no duty to accommodate Molina because she never requested an accommodation, and even if she had, no reasonable accommodation existed to allow her to work with her medical restrictions. DSI contends Molina is unable to establish that DSI terminated her because of her disability and in retaliation for her EEO activity, because the company had a legitimate non-discriminatory reason for its action. Specifically, DSI asserts it terminated Molina because of her inability to return to work without medical restrictions after her FMLA leave expired. DSI maintains Molina cannot establish that the company's reason is pretextual.

Molina argues she can establish that she is disabled based on evidence that she was substantially limited in the major life activities of lifting, standing, sitting, and sleeping. She also contends she is qualified for her position because there is evidence that her medical restrictions on lifting did not prevent her from performing any essential functions of her position. In regard to her accommodation claims, Molina argues she

31. Def.'s App. Ex. A at 3.

32. Molina Dep. at 84, 193; Loya Dep. at 11, 84; Def.'s App. Ex. A at 1, 4.

33. Def.'s App. Ex. A at 4.

34. Molina Dep. at 95–96; 201.

35. Molina Dep. Ex. 40.

36. Id.

37. Id.

38. Def.'s App., Ex. I.

39. Def.'s App. Ex. N.

40. Molina Dep. 208.

41. Def.'s App. Ex. P. The parties dispute whether Molina contacted DSI after she was cleared to return to work without restrictions. See Def.'s App. at 8; Molina Dep. at 207–08 & Ex. 42.

did request an accommodation from DSI and DSI could have accommodated her lifting restriction by providing her with assistance in lifting. She contends the evidence establishes that her termination was motivated by her disability, because DSI admitted she was terminated when she could not return to work without medical restrictions, and there is evidence the company had a policy of refusing to accommodate any disability. Finally, Molina argues there is genuine issue of material fact as to whether her termination was retaliatory, based on the temporal proximity between her EEO activity and her termination, and evidence a similarly situated coworker was treated differently.

## II. APPLICABLE LAW

### A. Summary Judgment Standard

Summary judgment should be granted only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." [42] "A genuine issue of material fact exists when there is evidence sufficient for a rational trier of fact to find for the non-moving party." [43] The substantive law defines whether disputed facts are material. [44] The party moving for summary judgment bears an initial burden of identifying those portions of the pleadings and any discovery on record, including any affidavits, which it believes demonstrate the absence of a genuine issue of material fact. [45] The court will "view all facts in the light most favorable to the non-moving party" [46] and draw all factual inferences in the nonmovant's favor. [47] If the moving party cannot demonstrate the absence of a genuine issue of material fact, summary judgment is inappropriate. [48]

If the movant does meet this burden, however, the nonmovant must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." [49] Accordingly, the "burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." [50] "[T]he nonmovant may not rely on mere allegations in the pleadings; rather, the nonmovant must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial." [51] The court does not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." [52] "If the nonmovant

---

**42.** Fed.R.Civ.P. 56(a).

**43.** *Perez v. Region 20 Educ. Serv. Ctr.,* 307 F.3d 318, 323 (5th Cir.2002) (citation omitted).

**44.** *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**45.** *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**46.** *Blow v. City of San Antonio, Tex.,* 236 F.3d 293, 296 (5th Cir.2001) (citations omitted).

**47.** *Cheatham v. Allstate Ins. Co.,* 465 F.3d 578, 582 (5th Cir.2006) (citation omitted).

**48.** *Tubacex, Inc. v. M/V Risan,* 45 F.3d 951, 954 (5th Cir.1995).

**49.** *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (internal quotation marks and citation omitted).

**50.** *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (internal quotation marks and citations omitted).

**51.** *Caboni v. Gen. Motors Corp.,* 278 F.3d 448, 451 (5th Cir.2002) (internal quotation marks and citations omitted).

**52.** *Little,* 37 F.3d at 1075 (citation omitted) (emphasis removed).

fails to meet this burden, then summary judgment is appropriate." [53]

In reviewing the parties' submissions, the court does not "weigh the evidence or evaluate the credibility of the witnesses." [54] The court will consider only evidence in the record that would be admissible at trial. [55] Summary judgment is appropriate "if no reasonable juror could find for the nonmovant." [56]

## III. DISCUSSION

■ The Texas Commission on Human Rights Act ("TCHRA") prohibits employers from discriminating against or discharging an employee because of the employee's disability. [57] Notably, this prohibition "applies only to discrimination because of or on the basis of a physical or mental condition that does not impair an individual's ability to reasonably perform a job." [58] Employers also violate the TCHRA if they "fail or refuse to make a reasonable workplace accommodation to a known physical or mental limitation of an otherwise qualified individual with a disability ... unless the [employer] demonstrates that the accommodation would impose an undue hardship on the operation of the business." [59]

■ Because the TCHRA was intended "to correlate state law with federal law in the area of discrimination in employment," federal precedent interpreting the Americans with Disabilities Act ("ADA") is authoritative on corresponding provisions of the TCHRA. [60]

■ A plaintiff can support a claim for disability discrimination either through direct evidence of discrimination or by establishing a *prima facie* case under the framework laid out in *McDonnell Douglas Corp. v. Green.* [61] Utilizing the *McDonnell Douglas* analysis:

a plaintiff must first make a prima facie showing of discrimination by establishing that: (1) he is disabled or is regarded as disabled; (2) he is qualified for the job; (3) he was subjected to an adverse employment action on account of his disability; and (4) he was replaced by or treated less favorably than non-disabled employees. Once the plaintiff makes his prima facie showing, the burden then shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. Once the employer articulates such a reason, the burden then shifts back upon the plaintiff to establish by a preponderance of the evidence that the articulated reason was merely a pretext for unlawful discrimination. [62]

■ "In considering the ultimate issue of discrimination, the trier of fact can consider both the evidence presented in the *prima facie* case and any evidence the

53. *Tubacex, Inc.,* 45 F.3d at 954.

54. *Caboni,* 278 F.3d at 451 (citation omitted).

55. *Fowler v. Smith,* 68 F.3d 124, 126 (5th Cir.1995) (citation omitted).

56. *Caboni,* 278 F.3d at 451 (citations omitted).

57. Tex. Lab.Code § 21.051.

58. Tex. Lab.Code § 21.105.

59. Tex. Lab.Code § 21.128(a)

60. *Rodriguez v. ConAgra Grocery Prods. Co.,* 436 F.3d 468, 474, n. 15 (5th Cir.2006) (quoting *Herrera v. CTS Corp.,* 183 F.Supp.2d 921, 925 (S.D.Tex.2002)).

61. See *Daigle v. Liberty Life Ins. Co.,* 70 F.3d 394, 396 (5th Cir.1995) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)) (other citations omitted).

62. *McInnis v. Alamo Community College Dist.,* 207 F.3d 276, 279–280 (5th Cir.2000) (citations omitted).

plaintiff produces that tends to show that the employer's articulated reason for the adverse employment action was pretextual."[63]

▇ In both claims for adverse action based on disability and claims for failure to accommodate, the employee has the threshold requirement of establishing she is a qualified individual with a disability.[64] In order to be "qualified," the employee with a disability must be able to carry out the essential functions of her position, with or without a reasonable accommodation.[65] Because Molina's claims for disability discrimination and failure to accommodate require analysis of whether she was a qualified individual with a disability, the court will address these issues first.

### A. Whether Molina is disabled

At the outset, Molina must establish that she meets the legal definition of an individual with a disability.[66] The TCHRA defines "disability" as "a mental or physical impairment that substantially limits at least one major life activity of that individual, a record of such an impairment, or being regarded as having such an impairment."[67] Major life activities include "sleeping, walking, standing, lifting, bending," as well as "the operation of a major bodily function."[68]

The TCHRA was amended effective September 1, 2009,[69] to reflect amendments to the ADA pursuant to the ADA Amendments Act of 2008 (ADAAA).[70] Congress amended the ADA to broaden its coverage by expanding the definition of what qualified as a "disability."[71] This expansion was undertaken in response to court decisions that Congress felt "had created an inappropriately high level of limitation necessary to obtain coverage under the ADA."[72] One stated purpose of the ADAAA was to reject EEOC regulations interpreting "substantially limits" to mean "significantly restricted."[73] Instead, Congress expressed it's intent that "the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations," and "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis."[74] Thus, the ADAAA directs that "[t]he definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act."[75]

63. *EEOC v. Chevron Phillips Chem. Co., LP,* 570 F.3d 606, 615 (5th Cir.Tex.2009) (citation omitted).

64. *See Griffin v. UPS,* 661 F.3d 216 (5th Cir. 2011) (citation omitted); *see also EEOC v. Chevron Phillips Chem. Co., LP,* 570 F.3d at 618–19.

65. *Rodriguez v. ConAgra Grocery Prods. Co.,* 436 F.3d 468, 474 (5th Cir.2006) (citing 42 U.S.C. § 12111(8)).

66. *See Chandler v. City of Dallas,* 2 F.3d 1385, 1394 (5th Cir.1993)

67. Tex. Lab.Code § 21.002(6)

68. Tex. Lab.Code § 21.001(11–a); *EEOC v. Chevron Phillips Chem. Co., LP,* 570 F.3d 606 (5th Cir.2009).

69. H.R. 978, 81st Leg., Reg. Sess. (Tex. 2009).

70. Pub. L. No. 110–325, 122 Stat. 3553. The conduct at issue in this case occurred after September 1, 2009, and the parties do not dispute that the ADAAA applies.

71. *Id.* at 3554.

72. *Id.*

73. *Id.*

74. *Id.*

75. 42 U.S.C. § 12102(4)(A). The amendments to the TCHRA track this language requiring that "the term 'disability': (1) shall be construed in favor of broad coverage of individuals under Subchapters B and C, to the

Molina has submitted evidence that since 2004 she has suffered from intermittent back pain, as well as pain, numbness and tingling in her right leg.[76] According to her medical records, on September 12, 2009 she was diagnosed with lumber internal disc derangement, lumbar radiculopathy, and lumbago.[77] Medical records show Molina's symptoms included "sharp lumbar pain," "lateral pelvic sharp burning pain," and "right leg sharp pain along the anterior thigh with a dull pressure on the posterior and lateral thigh as well as some numbness and tingling along the plantar aspect of the foot."[78] For the latter symptoms, the doctor noted "aggravating conditions include standing or walking."[79]

During her deposition, Molina testified that her medical condition affected her by causing significant pain.[80] The pain varied by the day, and she would experience pain "when I'm standing, sitting, when I'm trying to get up."[81] At one point in October 2009, her pain was so severe that she had to leave work to go to the hospital.[82] Molina's back pain affected her ability to stand, and sometimes she would have to sit down or rest.[83] Her condition also affected her ability to sit and if she sat too long sometimes she would have to move around, stand or stretch.[84] At times she also experienced severe pain when carrying things and bending over.[85] Sometimes while sleeping her pain was so severe she would wake up and have to get out of bed and stand up.[86] Molina's pain got worse as time progressed, and she testified that by April 2010 she was in pain every day and in severe pain one or two days out of the week.[87]

DSI argues Molina does not meet the definition of "disabled" because she is not substantially limited in any major life activity. Specifically, DSI points to Molina's testimony that her pain did not impact her ability to do any of her activities,[88] and did not change the way she did her household activities or how she worked.[89] DSI also cites to records from Molina's initial EEOC interview, where the intake worker wrote, "Cp denies that she is limited in any way, and that she does everything as before."[90]

However, these statements, when considered in context and in light of other evidence in the record, do not foreclose a finding that Molina was disabled. Molina testified that she "learned to tolerate the pain" to be able to continue working even on days when the pain was severe.[91] When testifying that she continued to do her household tasks such as cooking, cleaning and taking care of her disabled husband, Molina explained: "I had to do everything because I'm by myself."[92]

maximum extent allowed under those subchapters." Tex. Lab.Code § 21.0021(a).

76. Def.'s App. Ex. H.

77. Molina Dep. Ex. 35 at 3.

78. *Id.* at 1.

79. *Id.*

80. Molina Dep. at 53.

81. *Id.* at 53–54.

82. Molina Dep. at 179–81.

83. *Id.* at 167.

84. *Id.*

85. *Id.*

86. *Id.*

87. *Id.* at 55.

88. Def.'s App. Ex. D at 56.

89. *Id.*

90. Def.'s App. Ex. I.

91. Molina Dep. at 54.

92. *Id.* at 56.

EEOC regulations implementing the ADAAA, though not binding precedent, provide helpful guidance to understanding the new disability standard.[93] Specifically, the regulations instruct that when evaluating whether someone is "substantially limited" the focus should not be on the "outcomes" the person can achieve, as "an impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."[94] Instead, the EEOC advises comparing the "condition under which the individual performs the major life activity," or "the manner in which the individual performs the major life activity" as compared with the general population.[95] This comparison can include considering, among other factors, "pain experienced when performing a major life activity."[96] Thus, the fact that Molina learned to work through her pain to continue performing her regular tasks does not necessarily preclude her from being considered disabled. This is especially true where, as here, there is evidence Molina's condition affected her in the activities of sleeping, sitting, standing, and lifting.[97] Moreover, Molina testified she took pain medicine at night, and also took Tylenol, which if she was experiencing pain at an eight out of ten level would reduce the pain to a five.[98] This is relevant because the amendments to the TCHRA direct that a determination as to whether an individual is substantially limited must be made without taking into account mitigating measures, such as medication.[99]

DSI also argues Molina was not disabled because her pain was episodic and variable. However, the fact that Molina's back condition did not, at least initially, cause her pain every day is not determinative, as a disability can be "episodic" if it "substantially limits a major life activity when active."[100]

In addition to contending Molina was not substantially limited in the major life activities of sitting, standing, and sleeping, DSI argues that the activities Molina was undisputably limited in—lifting over 20 pounds and extreme bending at the waist—do not qualify as major life activities. Under the pre-amendment standard of the TCHRA, these activities might not qualify as major life activities.[101] However, the amended TCHRA explicitly includes "lifting" and "bending" within the statutory definition of major life activities.[102] Further, EEOC regulations advise that in identifying "major life activities," "the term 'major' shall not be interpreted strictly to create a demanding standard for disability," and that the question of "[w]hether an activity is a 'major life activity' is not determined by reference to whether it is of 'central importance to daily life.'"[103] The regulations further indicate

---

**93.** Proposed regulations were published on September 23, 2009 (*see* 74 FR 48431), and the final regulations went into effect on May 24, 2011. *See* 76 FR 16978, 16978 (Mar. 25 2011).

**94.** 29 C.F.R. § 1630.2(J)

**95.** *Id.*

**96.** *Id.*

**97.** Molina Dep. at 53–54; 166–68; Molina Dep. Ex. 35; Def.'s App. Ex. L.

**98.** Molina Dep. at 55, 169.

**99.** Tex. Lab.Code § 21.0021(b)(1).

**100.** Tex. Lab.Code § 21.0021(a)(2).

**101.** *See e.g. Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1120 (5th Cir.1998) (citations omitted).

**102.** Tex. Lab.Code § 21.002(11–a).

**103.** *Id.*

that major life activities can include "[t]he operation of a major bodily function, including ... musculoskeletal."[104]

DSI cites to a number of court cases in support of it's contention that Molina's medical condition did not qualify as a disability. However, as Molina points out, these cases were all determined under the pre-amendment standard of the ADA or TCHRA and thus are of limited precedential value to this case.[105]

■■■ In sum, a reasonable juror could find Molina was substantially limited in a major life activity when evaluated under the newly expanded scope of the TCHRA. Thus, Molina has presented sufficient evidence to overcome summary judgment on the issue of whether she is an individual with a disability under the TCHRA.

*B. Whether Molina was qualified for her position.*

■■■ A "qualified individual" is a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position."[106] "To avoid summary judgment on whether he is a qualified individual, [the employee] needs to show 1) that he could perform the essential functions of the job in spite of his disability or 2) that a reasonable accommodation of his disability would have enabled him to perform the essential functions of the job."[107] Additionally, "an individual is not qualified for a job if there is a genuine substantial risk that he or she could be injured or could injure others, and the employer cannot modify the job to eliminate that risk."[108]

### 1. Whether lifting over 20 pounds and extreme bending are essential functions of the position

Molina contends her restrictions on lifting over 20 pounds and extreme bending did not render her unqualified because these activities were not essential functions of her position. DSI takes the position that these activities were essential functions.

■■■ Essential functions must bear more than "a marginal relationship" to the employee's position.[109] To determine whether a function is essential, courts give consideration to the employer's judgment, as well as looking to evidence including, but not limited to written job descriptions, time spent performing the function, and consequences if the employee does not perform the function.[110]

As an initial matter, while there is evidence in the record that Molina's position required some bending,[111] there is no evidence that Molina's restriction from "extreme bending [at] the waist"[112] prevented her from performing the type of bending required of Patient Care Technicians ("PCT"). The parties' arguments focus on Molina's restriction from lifting over 20 pounds, and the court focuses its analysis accordingly.

104. *Id.*

105. Because the ADAAA and corresponding TCHRA amendments apply only to actions occurring since September 2009, thus far there are few cases interpreting the amended disability standard.

106. 42 U.S.C. § 12111(8).

107. *Turco v. Hoechst Celanese Corp.,* 101 F.3d 1090, 1093 (5th Cir.1996).

108. *Chandler v. City of Dallas,* 2 F.3d 1385, 1393 (5th Cir.1993) (internal quotation marks and citation omitted).

109. *Chiari v. City of League City,* 920 F.2d 311, 315 (5th Cir.1991) (citation omitted).

110. 29 C.F.R. 1630.2(n)(3); *see also* 42 U.S.C. § 12111.

111. *See e.g.* Def.'s App. Ex. E, F, G.

112. Def.'s App. Ex. L.

In asserting that such lifting is an essential function, DSI cites to an affidavit from Sylvia Spencer stating that PCTs such as Molina:

are responsible for assisting patients with moving, standing, sitting, and otherwise moving into proper position so that treatment can be administered. In order to perform this function, the Patient Care Technicians must be able to perform lifting.

While it is possible that other staff members and/or a Hoyer lift may be available to assist Patient Care Technicians in moving and/or lifting patients, that is not always the case.[113]

DSI relies on three different position descriptions in support of it's assertion that lifting over 20 pounds is an essential function. The first description, which plaintiff signed in April 2003, provides in relevant part:

PHYSICAL DEMANDS The physical demands described here are representative of those that must be met by an Associate to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

While performing the duties of this job, the associate is regularly required to stand ... and stoop, kneel, crouch or crawl ... The associate must occasionally lift and/or move up to 100 pounds with assistance and periodically assist others in moving patients where 100 pounds exertion is required.[114]

The second description, which Molina signed approximately a year later, states:

Physical: Essential Functions: Work is active; requires frequent lifting and carrying up to 20lbs., occasionally lifting and carrying 20–35 lbs., and occasionally lifting up to 40lbs. Requires ... frequently sitting, reaching at or above shoulder height, twisting and stooping/bending to perform patient care duties." [115]

The third description, which is undated, and is the only description actually prepared by DSI and not by Molina's previous employer, contains a paragraph almost identical to that of the first position description beginning with "PHYSICAL DEMANDS," including the same sentence on reasonable accommodations, and then continuing:

The employee is occasionally required to sit; reach with hands and arms; and to bend, stoop, kneel and crouch. The employee is occasionally required to lift up to 200 pounds with the assistance of coworkers or Hoyer lift.[116]

While these job descriptions, and particularly the second description, support DSI's contention that lifting was an essential function, Molina has provided contradictory evidence. Specifically, she testified that as a PCT she only had to lift and carry up to 20 pounds approximately once a month, and she does not recall ever having to do any heavy lifting of up to 40 pounds.[117] Further, she testified that even with the lifting restrictions she was still able to lift a patient with the help of the Hoyer lift or a coworker.[118] According to

---

113. Def.'s App. Ex. A at 2.

114. Def.'s App. Ex. E at 2.

115. Def.'s App. Ex. F at 2.

116. Def.'s App. Ex. G at 3.

117. Molina Dep. at 45–46. DSI contends that even with the assistance of a coworker Molina still needed to be able to lift approximately

half the weight of a patient. Def.'s App. at 4. However, Molina testified that the procedure when two people worked to transfer a patient to a chair was that one person would transfer the patient to the chair and she would hold the chair. Molina Dep. at 47.

118. Molina Dep. at 199.

Molina there was always someone available to help with lifting patients,[119] and PCTs always helped each other out and worked as a team to accomplish this.[120]

In addition, Molina's testimony is supported by that of Loya, her direct supervisor and the clinic manager. Loya testified that Molina was still able to perform all her essential job duties during the period in 2006 when her doctor restricted her from lifting more than 10 pounds.[121] He further testified that he never observed Molina being unable to perform her job duties, even when she was under a doctor's care due to medical conditions.[122]

DSI argues that even though Loya had accommodated Molina in the past by having others assist her with lifting, this accommodation was not approved by higher management and does not constitute evidence that lifting was not an essential function.[123] DSI cites to *Phelps v. Optima Health, Inc.*,[124] where the First Circuit Court of Appeals found heavy lifting to be an essential function of a clinical nurse's position, disregarding evidence that a manager crafted a special position, unapproved by upper-management, to allow the employee to avoid lifting by shifting those duties to other nurses.[125] Even assuming *Phelps* is consistent with Fifth Circuit precedent,[126] this case is distinguishable. Notably, in *Phelps* the employee did not dispute that heavy lifting was an essential function of a clinical nursing position, but instead argued that she was not a clinical nurse because a different position without lifting had been created for her.[127] Molina does not dispute that she was a Patient Care Technician, but rather disputes that lifting over 20 pounds was an essential function of the position. Further, there is evidence in the record, not merely that Loya repeatedly allowed Molina to work with lifting restrictions, but also—and more importantly—Molina testified that during her seven years at the clinic she never lifted a patient alone,[128] she does not recall ever doing any heavy lifting,[129] and that her restrictions on lifting did not

---

119. Molina Dep. at 46–48. However, Molina did indicate that another coworker may not be immediately available and sometimes she had to wait for help. *Id.* at 46–47.

120. Molina Dep. at 45–48.

121. Loya Dep. at 55.

122. Loya Dep. at 57. In addition, during his deposition Loya agreed that Molina's statement in her EEO complaint that she "had these same restrictions since October 2009 and had been able to perform all her job duties" was true. Loya Dep. at 99.

123. Spencer and DSI Regional HR Manager, Kelly Kolb, both aver that clinic managers such as Loya are supposed to consult with higher management before providing an accommodation. Def.'s App. Ex. A at 3; Ex. B at 2. Loya, however, testified that he had authority to accommodate employees' medical conditions by changing work duties or providing assistance in lifting. Loya Dep. at 14.

124. 251 F.3d 21 (1st Cir.2001)

125. *Id.* at 25–26.

126. *C.f. Carmona v. Southwest Airlines Co.,* 604 F.3d 848, 860 n. 3 (5th Cir.2010) ("[Employer's] decision to grant [employee] intermittent FMLA leave, despite the fact that he was frequently unable to give [employer] notice of his absences in advance, and without transferring him to a different position in the company, suggests that attendance was not in fact an essential requirement of his job.").

127. *Phelps,* 251 F.3d at 25–26.

128. Molina Dep. at 41.

129. Molina Dep. at 45–46. Specifically, Molina testified that the requirement in one position description for "[o]ccasionally lifting and carrying 20 to 35 pounds and occasionally lifting up to 40 pounds," was not accurate, as she could not recall ever having to pick up heavy items. *Id.*

cause her to do her job any differently.[130] In addition, as discussed previously, Molina's supervisor has testified that even when she was restricted in lifting, Molina was still performing her essential job duties.[131] Thus, while the focus in *Phelps* was on duties the plaintiff performed while being accommodated, here Molina has presented evidence as to duties she regularly performed—or did not perform—throughout the entire history of her employment.

 Thus, there is a triable issue of material fact as to whether lifting over twenty pounds without assistance was an essential function of Molina's position.

2. Whether Molina posed a safety risk

 The court must next consider whether Molina's disability created a safety threat to herself or those around her. This is relevant as "[a]n individual is not qualified for a job if there is a genuine substantial risk that he or she could be injured or could injure others, and the employer cannot modify the job to eliminate that risk."[132] "Whether one is a direct threat is a complicated, fact intensive determination."[133] This determination "cannot be based on unfounded fears or stereotypes; it must be veritable."[134]

DSI contends Molina's restrictions on lifting and bending created a safety risk because she would be unable to respond to an emergency situation where she may have to perform CPR on a patient or which may require "lifting, catching, or otherwise moving a patient."[135] Specifically, Spencer testified that medical emergencies have occurred in DSI facilities including "patients falling, fainting and crashing," and she believes that a PCT whose lifting ability is restricted poses a risk to patients and the employee.[136]

However, Molina again provides contradictory evidence on this issue through Loya's testimony. Specifically, Loya testified that he never felt Molina posed a threat to herself or others even when she was working with restrictions, and that he would not have allowed her to work had he thought she posed a risk.[137] Loya further testified that no one ever told him that Molina was placed on medical leave because she posed a threat to the patients or herself.[138]

Finally, DSI cites to a number of cases in support of it's contention that Molina's restrictions constituted a safety threat. Most of these cases are clearly distinguishable from the facts of this case.[139] The

---

130. Molina Dep. at 86–87.

131. Loya Dep. at 55, 57, 99.

132. *Chiari v. City of League City*, 920 F.2d 311, 317 (5th Cir.1991). The ADA allows qualification standards that "include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace," and defines a "direct threat" as a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir.1996) (internal quotation marks omitted) (quoting 42 U.S.C. § 12113(b)).

133. *Rizzo v. Children's World Learning Ctr.*, 84 F.3d 758, 764 (5th Cir.1996).

134. *Chiari v. City of League City*, 920 F.2d

311, 317 (5th Cir.1991).

135. Def.'s App. Ex. A at 4.

136. Def.'s App. Ex. A at 2–3. (internal quotation marks omitted).

137. Loya Dep. at 58. DSI claims that "Loya also testified that Molina could hurt herself or a patient by working with lifting restrictions." Def.'s Reply in Support of Mot. for Summ. J. at 3 n. 5 (citing Loya Dep. at 102:19–103:3). On review, the court cannot locate any such statement on page 102 of Loya's deposition. Page 103 of the deposition is not part of the Record, and the court will not speculate on alleged testimony not submitted.

138. Loya Dep. at 102.

139. DSI cites to *Daugherty v. City of El Paso*, where an insulin-dependent diabetic was

most similar case is *Guneratne v. St. Mary's Hospital,* which involved a clinical nurse working in a hospital with a lifting restriction.[140] In *Guneratne* the court concluded that lifting was an essential function based on, among other things, evidence that the job description required the ability "to lift or carry weight up to 40 lbs 61–100% of the time, and over 40 lbs. 31–60% of the time;" and the fact that such requirements were essential "because nurses must be prepared to immediately react in emergency situations, which Plaintiff herself suggests occur possibly once a week or once every four or five days." [141] In contrast, Molina's position descriptions require only occasional lifting of over 20 pounds, and two specify that this require-ment is for lifting with assistance.[142] Additionally, although conceding that an emergency situation was possible, Molina testified that she could not recall ever experiencing one.[143] The facts here are distinguishable from *Guneratne,* and the court cannot say as a matter of law that an employee with lifting restrictions performing direct patient care at any type of medical facility constitutes a danger.[144]

 Given the conflicting testimonies of Loya, Kolb, and Spencer, the court finds Molina has established a genuine issue of material fact as to whether her restrictions created a risk of injury to herself or others.[145]

found unqualified for the position of city bus driver. 56 F.3d 695, 698 (5th Cir.1995). Significantly, the court in *Daugherty* noted that Department of Transportation regulations prohibited individuals with this condition from operating commercial vehicles, and found the employee did not contest that "the ADA's requirement that the employer reasonably accommodate the disability would extend to violating federal law." *Daugherty,* 56 F.3d at 697. DSI also cites to *Wilson v. Phillips Petroleum Co.,* where an employee with manic-depressive disorder, which caused her to hear voices and experience erratic mood swings and memory loss, worked in a refinery. 1998 WL 874835 at *1 (N.D.Tex. Dec. 8, 1998). The employee worked around volatile chemicals, was required to use power tools, and previously had to respond to emergencies, including putting out fires and rescuing people who had been severely burned or gassed. *Id.* The work environment was such that "there were any number of things that Plaintiff could do that would cause a dangerous situation, including an explosion." *Id.* The Plaintiff in *Wilson* admitted there was nothing the employer could do to help her to perform her job when she entered a manic period, and the court, unsurprisingly, held that she posed a safety risk. *Id.* at *3–4. Finally, DSI cites to *Ketcher v. Wal–Mart Stores, Inc.,* where a forklift operator suffering from dizzy spells was found to pose a safety risk. 122 F.Supp.2d 747, 749–50 (S.D.Tex.2000). Notably, in *Ketcher* the employee's own doctor submitted a letter stating that the employee's limitations posed a dan-ger, and the employee had no evidence to refute this, aside from arguing that he had worked in the position for several years without problems. The court found this evidence insufficient to defeat summary judgment because the employee had only begun experiencing dizzy spells in the last months of his employment, and during much of this time he was out on leave. *Id.* at 752–53.

140. 943 F.Supp. 771 (S.D.Tex.1996).

141. *Id.* at 774 (internal quotation marks and citations omitted).

142. Def.'s App. Ex. E, F, G.

143. Molina Dep. at 48.

144. Indeed, the court in *Guneratne* explicitly declined to articulate any such sweeping conclusion, holding "[a]lthough these [physically demanding] tasks may not be essential to the work performed by a trained registered nurse, the summary judgment record is clear that these tasks were performed by the clinical nurses at St. Mary's and were an integral part of patient care." *Guneratne v. St. Mary's Hosp.,* 943 F.Supp. 771, 774 (S.D.Tex.1996).

145. The Fifth Circuit has recognized it is currently unclear which party bears the burden of proof in establishing whether the employee's disability poses a danger. *See Rizzo v. Children's World Learning Ctrs., Inc.,* 213 F.3d 209, 213 n. 4 (5th Cir.2000) (citation omitted).

## C. Claim for failure to accommodate

Having determined that, for purposes of summary judgment, Molina has presented sufficient evidence that she was a qualified individual with a disability, the court must now evaluate Molina's claims that DSI failed to provide her with a reasonable accommodation. Molina's Petition includes two claims for failure to accommodate. Her first claim is that DSI failed to accommodate her when it refused to allow her to continue working with her medical restrictions.[146] Molina's second claim is that DSI denied her a reasonable accommodation because it refused to extend her medical leave.[147]

The TCHRA provides that it is unlawful for an employer "to fail or refuse to make a reasonable workplace accommodation to a known physical or mental limitation of an otherwise qualified individual with a disability ... unless the [employer] demonstrates that the accommodation would impose an undue hardship on the operation of the business."[148] It is the employee's responsibility to notify the employer of her need for a reasonable accommodation.[149] "The employee must explain that the adjustment in working conditions or duties she is seeking is for a medical condition-related reason, but the employee does not

have to mention the ADA or use the phrase 'reasonable accommodation.' Plain English will suffice."[150]

■■■ Accommodations can include, among other things, "job restructuring, part-time or modified work schedules, reassignment to a vacant position."[151] Importantly, the employee's right is to a "reasonable accommodation, not to the employee's preferred accommodation."[152] However, "when an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA."[153]

DSI puts forth two arguments as to why it is entitled to summary judgment on Molina's claim for failure to accommodate. First, DSI argues it had no obligation to accommodate Molina because she failed to properly request a reasonable accommodation. However, there is evidence in the Record that on or around November 2, 2009, Molina provided Loya with a note from her doctor stating, "Mrs. Molina had a lumbar procedure today. She should not lift > 20 LBS or any extreme bending @ the waist."[154] EEOC guidelines provide that a health professional can request a reasonable accommodation on the employee's behalf.[155] These guidelines further

---

However, even if Molina were found to have the burden, the court finds she has met this burden for the reasons articulated.

**146.** Pl.'s Original Pet. at 4.

**147.** *Id.*

**148.** Tex. Lab.Code § 21.128(a)

**149.** *See Taylor v. Principal Fin. Group,* 93 F.3d 155, 165 (5th Cir.1996).

**150.** *EEOC v. Chevron Phillips Chem. Co., LP,* 570 F.3d at 621 (5th Cir.2009) (citing EEOC "Requesting Reasonable Accommodation" in Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the

ADA (Oct. 17, 2002), available at http://www.eeoc.gov/policy/docs/accommodation.html).

**151.** 42 U.S.C.A. § 12111(9).

**152.** *EEOC v. Agro Distrib. LLC,* 555 F.3d 462 (5th Cir.2009).

**153.** *Jenkins v. Cleco Power LLC,* 487 F.3d 309, 316 (5th Cir.2007) (internal quotation marks and citation omitted).

**154.** Molina Dep. at 81, 84; Def.'s App. Ex. L.

**155.** See EEOC "Requesting Reasonable Accommodation" in Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the ADA (Oct. 17, 2002), available at http://www.eeoc.gov/policy/docs/accommodation.html.

provide that a letter from an employee's doctor releasing an employee to work with specific restrictions constitutes a request for reasonable accommodation.[156] Thus, there is evidence establishing that Molina requested a reasonable accommodation.

■ "Once the employee presents a request for an accommodation, the employer is required to engage in the interactive process so that together they can determine what reasonable accommodations might be available."[157] Here, there is no evidence that DSI ever initiated such a process with Molina to determine what, if any, appropriate accommodations existed.[158] To the contrary, Loya testified that DSI's corporate office never contacted him to see whether Molina could perform her essential duties with the restrictions,[159] and that he is not aware of any effort by DSI to accommodate Molina before terminating her.[160]

■ DSI's second argument is that, even if Molina properly requested an accommodation, the company had no duty to accommodate her because no reasonable accommodation existed. DSI maintains that there were only three possible accommodations Molina could have requested: (1) that she be assigned to a new position with different duties; (2) that she be given indefinite medical leave; or (3) that another employee be made available to help Molina with lifting, which, DSI contends, would have "essentially required DSI to staff another person on the floor solely for the purpose of assisting her."[161] The duty to accommodate does not require employers to create a new position for a disabled employee,[162] and thus this accommodation would not be reasonable. Further, DSI points to uncontroverted evidence that at the time she was terminated, Molina had not yet scheduled a date for her surgery, and the company argues it is not reasonable to require an employer to provide an employee with indefinite medical leave.[163] The Fifth Circuit Court of Appeals has held that extended indefinite medical leave is not a reasonable accommodation.[164] Thus, the court will grant summary judgment on Molina's claim that DSI failed to accommodate her because it refused to extend her medical leave.[165]

However, the court finds Molina has established a genuine issue of material fact as to whether DSI violated the TCHRA

156. *Id.; see also EEOC v. Chevron Phillips Chem. Co., LP,* 570 F.3d at 621 (Finding jury could reasonably find that doctor's note releasing employee to work at location nearer employee's home constituted request for reasonable accommodation).

157. *EEOC v. Chevron Phillips Chem. Co., LP,* 570 F.3d at 622 (5th Cir.2009) (emphasis added) (citation omitted). The court in *Taylor* also affirmed the general principle that "once an accommodation is properly requested, the responsibility for fashioning a reasonable accommodation is shared between the employee and employer." 93 F.3d at 165.

158. *See Cutrera v. Bd. of Supervisors,* 429 F.3d 108, 112–13 (5th Cir.2005) (finding summary judgment inappropriate when employee notified employer of her limitations but could not immediately identify appropriate accommodation and employer terminated her before "an accommodation [could] be considered or [recommended]").

159. Loya Dep. at 84.

160. Loya Dep. at 105.

161. Def.'s Mot. For Summ. J. at 16 (citation omitted).

162. DSI presents uncontroverted evidence that it had no vacant positions available for which Molina would have been qualified. *See* Def.'s App. Ex. A at 4; Ex. B at 3.

163. See Def.'s App. Ex. D at 112, 121–22.

164. *See Reed v. Petroleum Helicopters, Inc.,* 218 F.3d 477, 481 (5th Cir.2000).

165. Pl.'s Original Pet. at 4.

when the company refused to provide Molina with a reasonable accommodation to allow her to continue working with her medical restrictions.

 In accommodating an employee with a disability, an employer is not obligated "to relieve an employee of any essential functions of his or her job, modify those duties, reassign existing employees to perform those jobs, or hire new employee ... to do so."[166] However, as discussed previously, here there is a genuine dispute as to whether lifting over twenty pounds was an essential functions of the PCT position. Further, there is conflicting evidence as to whether providing Molina with assistance in lifting would require scheduling another PCT solely to assist her. DSI makes this argument relying on Loya's testimony that in October and November 2009 he scheduled another PCT to assist Molina with lifting.[167] However, Loya also denied that this additional's PCT's sole purpose was to assist Molina, and further stated that he never actually witnessed the additional PCT help Molina with lifting.[168] In addition, Molina testified that employees always helped each other with lifting and that she had never lifted a patient without assistance.[169] This, evidence, viewed in the light most favorable to Molina, suggests it would not cause DSI undue hardship to provide lifting assistance, and that such assistance would cause little to no change in the current working arrangements and would not require scheduling additional employees.

Other evidence in the Record suggests DSI may have stopped accommodating Molina's restrictions not based on hardship or safety concerns, but because of a new policy prohibiting employees with any restrictions from working. Specifically, Loya testified that he had previously tried to accommodate employees' medical restrictions, but in 2010 he was notified of a new policy that "anybody with a restriction would stay home, anybody ... If they were hurt in any way, shape, or form, they would stay home."[170] Loya testified that this blanket policy applied regardless of whether the employee could still perform his or her essential job duties, and that pursuant to this policy DSI would make no effort to accommodate any employee's restrictions.[171] Loya testified that this policy applied to employees with physical restrictions like Molina, as well as non-physical restrictions, such as the need for a change in schedule.[172] He stated, "[a]ccording to my supervisors, if they have any restrictions they cannot go back to work ... That's the bottom line nowadays."[173] The policy Loya described would violate the TCHRA,[174] and DSI disputes that such a policy existed.[175] Nonetheless, Loya's testimony raises further questions as to whether DSI made a good faith effort to accommodate Molina before terminating her. Thus, the court finds there are genuine issues of fact that preclude summary

---

166. *Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir.1999).

167. Loya Dep. at 76.

168. Loya Dep. 76–78.

169. Molina Dep. at 41, 45–48.

170. Loya Dep. at 22.

171. Loya Dep. at 22–23.

172. Loya Dep. 30–31.

173. Loya Dep. at 43.

174. *See e.g. Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 475 (5th Cir.2006) (finding employer's blanket policy against hiring anyone perceived as having uncontrolled diabetes as contradictory to "the TCHRA/ADA's emphasis on treating impaired job applicants as individuals").

175. *See* Def.'s App. Exs. A & B.

judgment on Molina's claim that DSI failed to accommodate her when it prohibited her from working with her restrictions.

### D. Claim for termination in violation of TCHRA

Molina has also brought a claim that DSI terminated her in violation of the TCHRA. As an initial matter, the parties disagree on which legal standard should be applied in analyzing Molina's termination claim. DSI asserts that this claim is properly analyzed under the framework laid out in *McDonnell Douglas Corp. v. Green*.[176]

This burden-shifting framework applies to the vast majority of discrimination claims where plaintiffs can present only circumstantial evidence of discrimination.[177] In contrast, where there is direct evidence of discrimination, an employee need only establish that she is a qualified individual with a disability and that her disability was a motivating factor in the adverse employment decision.[178]

In this case, a reasonable jury could find under either standard that Molina has established a genuine issue of material fact that her disability was a motivating factor in DSI's decision to terminate her.[179] Utilizing the *McDonnell Douglas*

analysis, Molina has established the first two *prima facie* elements, because, as previously discussed, she has put forth competent summary judgment evidence that she is a qualified individual with a disability. Molina can establish the third *prima facie* element, that she was subjected to an adverse action based on her disability,[180] because DSI readily admits that Molina was terminated because she was unable to return to work without lifting restrictions at the time her FMLA leave expired.[181] Finally, the fourth *prima facie* element is established through Loya's testimony that he has not permitted any individual with restrictions to work since early 2010, indicating that the employee hired to replace Molina did not have a disability.[182]

DSI asserts it had a legitimate non-discriminatory reason for terminating Molina, based on company policy that employees who fail to return from FMLA leave will be terminated. This argument is hardly persuasive given that DSI forced Molina to take leave, and refused to accommodate her despite evidence she could still perform her essential functions.[183] DSI also argues there is no evidence of discrimination because its policy prohibits any employee with a lifting restriction from working, whether or not the employee is disabled. Loya testified that since

**176.** See *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir.1995) (citing 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)) (other citations omitted).

**177.** *Id.*

**178.** See *Rizzo*, 84 F.3d at 763 (5th Cir.1996) (citing a similar, though not identical, standard for direct evidence cases under the TCHRA); *see also Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex.2001) (finding "a motivating factor is the correct standard of causation for the plaintiff in all TCHRA unlawful employment practice claims") (internal quotation marks omitted).

**179.** See *Quantum Chem. Corp.*, 47 S.W.3d at 480 (Tex.2001); *see also Pineda v. UPS*, 360 F.3d 483, 488 (5th Cir.2004).

**180.** *McInnis*, 207 F.3d at 279 (citations omitted).

**181.** Def.'s Mot. for Summ. J. at 18; Def.'s Rep. In Support of Mot. for Summ. J. at 5.

**182.** Loya Dep. at 20–21, 48–49, 82, 107. It is unclear from the Record whether Rosa Gomez or Leticia Santos was hired to replace Molina. *Compare* Loya Dep. at 49 *with* Loya Dep. Ex. 18 at 2–3.

**183.** See *supra* notes 31–36, 116–21, 157–59, and accompanying text.

the policy has gone into effect he has had to place three other workers with restrictions on leave, at least two of whom, Jose Luis Urrieta and Susan Wilber, had lifting restrictions due to work-related back injuries.[184] In light of the apparent similarities between Molina's condition and that of Urrieta and Wilber,[185] this hardly indicates a lack of discrimination based on Molina's disability. Moreover, it is undisputed that DSI was aware that Molina's impairment in lifting was due to her medical condition.[186] In addition, there is no evidence that DSI's alleged policy prohibiting employees with lifting restrictions from working was ever documented in writing, and Molina has never seen or been shown a written policy to this effect.[187] Loya, who had managed the DSI clinic since 2006, was himself unaware of such policy. Specifically, he testified that in October 2009, Kolb asked him why he was allowing Molina to work when she had back problems, and he told Kolb that he was not aware that Molina could not work.[188] Loya testified that in December 2009 he 'got in trouble' with upper management for allowing Molina to work with restrictions, and either at or around the same time was notified for the first time of the company's policy prohibiting employees with restrictions from working.[189] This evidence, combined with Loya's testimony that he never felt Molina posed a danger and had never observed her unable to perform her essential functions, could allow a jury to reasonably find DSI's stated reason to be a pretext for discrimination based on her disability.

### E. Retaliation Claim

■ Molina's final claim is that DSI terminated her in retaliation because she filed an EEOC charge. Under the TCHRA, it is unlawful to retaliate or discriminate against an employee who undertakes a protected activity, which includes filing a charge of discrimination.[190] To overcome summary judgment on this claim, Molina has the initial burden of establishing (1) that she participated in a protected activity; (2) that her employer took adverse action against her; and (3) that there is a causal connection between the protected activity and the employer's adverse action.[191] From this point:

> If the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action. The employer's burden is only one of production, not persuasion, and involves no credibility assessment. If the employer meets its burden of production, the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory or retaliatory purpose. To carry this burden, the plaintiff must rebut each nondiscrimina-

---

184. Loya Dep. at 24–25; 30.

185. *Id.*

186. *See Hypes v. First Commerce Corp.,* 134 F.3d 721, 726 (5th Cir.1998) (noting in dicta "if [employee's] excessive absences were linked to his disability, and [employer] knew it when they fired him, we might say that excessive absence is a pretext or even a proxy for [employee's] disability, and he would have an arguable claim under the ADA and LCRHP").

187. Molina Dep. at 193–94.

188. Loya Dep. at 67–68.

189. Loya Dep. at 79–80.

190. Tex. Lab.Code § 21.055

191. *McCoy v. City of Shreveport,* 492 F.3d 551, 556–57 (5th Cir.2007).

tory or nonretaliatory reason articulated by the employer.[192]

■ The parties do not dispute that Molina has established the first two prongs of a *prima facie* case. However, DSI argues Molina has not provided sufficient evidence to establish a causal nexus between her action of filing an EEOC charge and DSI's decision to terminate her. Molina contends that the temporal proximity of her filing the charge on February 25, 2010, and DSI taking action to terminate her on April 3, 2010, is sufficient to make a *prima facie* showing on this element.[193] The court finds because these actions occurred approximately five weeks apart, this is sufficiently close in time to establish an inference of a causal link for *prima facie* purposes.[194]

■ DSI asserts a legitimate non-retaliatory reason, specifically the company states that Molina was terminated at the expiration of her FMLA leave because she could not return to work without restrictions. DSI further points to evidence that Molina was placed on FMLA leave prior to her EEO activity.

■ Molina argues this reason is pretextual because, in addition to the temporal proximity, there is also evidence that she was treated less favorably than a similarly situated coworker, Jose Luis Urrieta.

Specifically, Loya testified that in 2010, Urrieta, a patient care technician, suffered aback injury and was given a lifting restriction similar to Molina's.[195] There is no evidence that Urrieta ever engaged in a protected activity. According to Loya, Urrieta was out on leave for approximately four or five months and his job was kept open for him until he returned.[196] In it's Reply, DSI submitted records showing Urrieta out on leave for only about 11 weeks in the spring of 2010.[197] DSI now asks the court to disregard Loya's testimony in light of the conflicting evidence in the Record. The court declines to do so, as "it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh competing evidence and inferences." [198]

In addition, the record also contains evidence that Loya had threatened to retaliate against Molina on previous occasions. Specifically, Molina testified that in October 2010, Loya called her the day before her scheduled medical procedure and was angry that she was taking time off.[199] She avers that when she reminded Loya that she had previously given him a letter from her doctor about procedure, he threatened to put her on medical leave.[200] Molina subsequently contacted DSI's HR office to find out if Loya could put her on involun-

**192.** *Id.* at 557 (internal citations omitted).

**193.** Def.'s App. Exs. I, N.

**194.** *See Stroud v. BMC Software Inc.*, 2008 WL 2325639, *3–6, 2008 U.S.App. LEXIS 12244, *10–17 (5th Cir.2008) (reviewing Fifth Circuit jurisprudence on the timing required to establish a causal connection for purposes of a *prima facie* showing in retaliation claims). The Court in *Stroud* cites to *Richard v. Cingular Wireless LLC*, 233 Fed.Appx. 334, 338 (5th Cir.2007), noting that in that case, "we concluded that two and a half months is a short enough period to support an inference of a causal link." *Stroud,* 2008 WL 2325639 at *6, 2008 U.S.App. Lexis 12244 at *16.

**195.** Loya Dep. at 24–25.

**196.** Loya Dep. at 25–26.

**197.** Def.'s Reply in Support of Mot. for Summ. J., Ex. B.

**198.** *Smith v. Xerox Corp,* 371 Fed.Appx. 514, 518 n. 9 (5th Cir.2010) (internal quotation marks and citation omitted).

**199.** Molina Dep. at 182–83.

**200.** *Id.*

tary medical leave.[201] Despite the threat, Loya did permit Molina to return to work after her medical procedure.[202] Upon her return, Molina requested that she only be scheduled to work on Mondays and Wednesdays because she wanted to leave Fridays free for her back treatments.[203] Loya initially accommodated Molina's request, but in December 2009 when Molina received the schedule for January 2010 she saw that Loya had scheduled her for days other than Mondays and Wednesdays.[204] Molina testified that when she confronted Loya about this he was upset that she had called HR in October about her medical leave rights and told her she should not have gone over his head and contacted HR.[205] Molina was subsequently placed on involuntary FMLA leave. On January 13, 2010, Molina faxed a letter to Melissa Monnin reporting Loya's statements about her contact with HR and expressing concern that the Loya's failure to accommodate her schedule and the company placing her on forced medical leave were retaliatory actions.[206] Specifically, Molina wrote: "I feel that I am being punished for asking about medical leave. I would ask that you investigate this."[207] Loya testified that Monnin never contacted him about this complaint by Molina.[208] Although the actions Molina complained of to Monnin are not the adverse actions at issue in her

retaliation claim, "[e]vidence of retaliation in other circumstances may of course be probative as to pretext."[209]

Consequently, the court finds that the temporal proximity between Molina's protected activity and the adverse action; the evidence that a similarly situated employee may have been treated more favorably; and Molina's testimony as to Loya's alleged past retaliatory threats and actions, taken together create a genuine issue of material fact as to whether Molina's EEO activity was a determinative factor in DSI's decision to terminate her.[210]

## IV. CONCLUSION AND ORDERS

For the reasons stated above, the court finds Molina has raised genuine questions of material fact as to whether she was a qualified individual with a disability under the TCHRA, whether DSI failed to provide her with a reasonable accommodation when it prohibited her from working with medical restrictions, whether her termination was motivated by her disability, and whether DSI retaliated against her based on her EEO activity. However, the court finds Molina has failed to establish a genuine issue of fact that indefinite extended medical leave was a reasonable accommodation, and will grant summary judgment

**201.** *Id.* at 68–69, 183.

**202.** *Id.* at 184.

**203.** *Id.* at 70–71, 77.

**204.** *Id.* at 190.

**205.** *Id.* 190–91.; Molina Dep., Ex. 40.

**206.** Molina Dep., Ex. 40.

**207.** *Id.*

**208.** Loya Dep.a t 91.

**209.** *Rios v. Rossotti,* 252 F.3d 375, 381 (5th Cir.2001); *see also Smith v. Xerox Corp,* 371 Fed.Appx. 514, 516 (5th Cir.2010) (finding on

consideration of JMOL that "[a]lthough events following the EEOC complaint may be the most relevant to the retaliation charge, [employee's] allegations cannot be parsed and considered in a vacuum. Instead, all the evidence relevant to [employee's] employment and interaction with [supervisor] provides background and context for the later termination decision and may be considered").

**210.** *See Pineda,* 360 F.3d at 488–89 (holding that "but for" is the proper causation standard in retaliation claims under Section 21.055 of the Texas Labor Code).

for DSI on this claim. Accordingly, the court enters the following Orders:

1. "Defendant's Motion for Summary Judgment" [ECF No. 16] is **GRANTED** in part and **DENIED** in part.

2. Molina's claim against DSI for "failure to provide reasonable accommodation by denying Plaintiff additional medical leave" identified as "Count Two" in Plaintiff's Original Petition [211] is **DISMISSED WITH PREJUDICE.**

**SO ORDERED.**